UNITED STATES of America

v.

Gilbert M. MORGAN, Appellant.

No. 72–1639.

United States Court of Appeals,
District of Columbia Circuit.

May 31, 1977.

Rehearing En Banc Denied
Sept. 21, 1977.

Samuel J. Lanahan, Patricia D. Douglass and Herbert M. Silverberg, Washington, D. C., were on the brief, for appellant.

Earl J. Silbert, U. S. Atty., John A. Terry and Hamilton P. Fox, III, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before BAZELON, Chief Judge, WRIGHT, Circuit Judge and VAN PELT,* Senior United States District Judge for the District of Nebraska.

Opinion for the Court filed by Chief Judge BAZELON.

Dissenting Opinion filed by Senior District Judge VAN PELT.

BAZELON, Chief Judge.

This case first reached this court in 1972 when appellant Morgan appealed from the trial court's denial of his motion to withdraw his guilty pleas. Finding the record inadequate for proper consideration of the district court's decision, we remanded the record for a thorough hearing concerning the circumstances which led to Morgan's pleas of guilty.[1] Following that hearing,[2] the district court renewed its denial of Morgan's motion to withdraw his guilty pleas.[3] We reverse.

## I. THE FACTS

Morgan had married his wife Lisa when she was sixteen, eight-months' pregnant, and still attending high school. It was a stormy marriage, and on June 8, 1971, she took the baby and all the furniture and moved back into her mother's house. This culminated what Morgan perceived as a long series of interferences by his mother-in-law and caused him to despair of ever having a happy family life.

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. *United States v. Morgan*, 157 U.S.App.D.C. 197, 482 F.2d 786 (1973). In two subsequent actions, *we enlarged the scope of the remand*. First, we permitted the district court to reconsider its earlier denial of sentencing under the Federal Youth Corrections Act, as well as to reconsider Morgan's motion to withdraw his guilty pleas in favor of a plea of not guilty by reason of insanity. *United States v. Morgan,* 160 U.S.App.D.C. 278, 491 F.2d 71 (1974). Then, on August 16, 1974, we entered a Memorandum Order ruling, *inter alia,* that "[t]he scope of the hearing on remand includes the adequacy and validity of examinations administered to appellant at the Medical Center for Federal Prisoners at Springfield, Missouri."

2. Held on October 23, 24, 25, and 30, 1974, and July 29, 1975.

3. Findings of Fact, filed December 5, 1975.

His own account of the crime is that on the morning of June 9 he heard voices telling him to kill his wife and baby and himself so that they could all be together in heaven.[4] He went to his mother-in-law's house and shot Lisa and her mother and the baby.[5] Having run out of bullets, he tried to stab himself with a kitchen knife. The first knife only bent and the second refused to penetrate.[6] At some point during the incident, he telephoned the police and reported one of the deaths. When the police arrived, he waved his empty pistol at them in the hopes that they would kill him. Although they did fire three shots at him, all three missed.[7] He retreated into the house, then returned and surrendered.

After his arrest, he was taken before a United States Magistrate who ordered him committed to the District of Columbia Jail, with the notation "MPDC HAS ADVISED —DEF. HAS SUICIDAL TENDENCIES." In a second order, the Magistrate commanded that Morgan be examined by a psychiatrist and that the results be reported back by June 18, the date set for the preliminary hearing.

Immediately upon his arrival at the District of Columbia Jail Morgan was examined by medical personnel and placed in "full restraints" in the jail hospital. The next day a District of Columbia Department of Human Resources staff psychiatrist examined him and recommended to the court that "an extended period of time in a hospital setting be devoted to a more complete psychiatric examination."[8]

At the June 18 preliminary hearing the Magistrate recommitted Morgan to the District of Columbia Jail, noting on the order that the Public Defender counsel "claims no further need for concern about possible suicide by the defendant." The record provides no information about the basis for counsel's claim.

On June 25, upon defendant's motion for an examination of his mental competency, a district judge ordered Morgan committed to Saint Elizabeths Hospital for a psychiatric examination pursuant to D.C.Code § 24–301(a) (Supp. V, 1972). The order directed that the examination determine not only whether Morgan was competent to stand trial but also whether the offenses, if they were committed by him, were the product of "a mental disease or defect which substantially affected his mental or emotional processes and substantially impaired his behavioral controls."[9]

Morgan was not transferred to St. Elizabeths until July 27 because of the crowded conditions there. He remained there until September 3, when he was returned to the jail. On September 2, Dr. Strawinsky, the Hospital's acting director of forensic programs, submitted a report to the court which read in pertinent part:

Dr. Albert E. Marland, a qualified psychiatric consultant, recently examined Mr. Morgan and the following determinations were made. Mr. Morgan has been diagnosed schizophrenia, Chronic Undifferen-

---

4. Morgan recounted this story to the D.C. Jail psychiatrist on June 16, 1971, Def. Ex. 20; to a resident psychiatrist at St. Elizabeths on August 6, 1971, Def. Ex. 36; to Dr. Marland on August 12, 1971, Def. Ex. 13 and 14; to the staff at Springfield in March 1972, Def. Ex. 48b; and to Dr. Yochelson while under the influence of sodium amytal on March 6, 1975, Def. Ex. 53.

5. The government and the trial court make much of the fact that Morgan killed his mother-in-law, whose death was not part of his "plan" to unite his family in heaven. However, according to Morgan, she was in the middle of the fray, holding the baby and fighting Morgan

for the gun, and she might well have been shot unintentionally. See, e. g., Def. Ex. 36 at 4–5.

6. The police did find three kitchen knives at the scene, one with a bent blade. Def. Ex. 17 at 4. At the time of his arrest Morgan had a severe cut on his hand. Def. Ex. 17 at 3.

7. This is consistent with the police report. Def. Ex. 17 at 3.

8. Def. Ex. 20.

9. This was the relevant inquiry before our decision in United States v. Brawner, 153 U.S.App. D.C. 1, 471 F.2d 969 (1972).

tiated Type and is competent for trial by virtue of having a rational and factual understanding of the proceedings pending against him and being able to consult with counsel with a reasonable degree of rational understanding. Furthermore, on or about June 9, 1971, the date of the alleged offense, he was suffering from a mental disease which substantially affected his mental and emotional processes and substantially impaired his behavior controls and the alleged offenses, if committed by him, were the products of his mental condition.[10]

No supporting facts or reasoning were included.[11]

Dr. Strawinsky's report to the court summarized a report which Dr. Marland had submitted to her typed on the Hospital's Standard Form 507, which is the form for a final report. The report was countersigned by Dr. Strawinsky. There was also an Addendum signed by both Dr. Marland and Dr. Strawinsky, which read in part, "I attempted again to examine this patient, but he refused to enter the examining room. . . . My opinion is unchanged that he is basically a schizophrenic with great impulsivity and depression. I see no substantial change in him despite medication."[12]

On September 16, after less than two weeks at the Jail, Morgan was returned to St. Elizabeths because of a "recent suicide attempt" at the Jail. He remained at St. Elizabeths until January 1972. During September he continued to be examined by Dr.

Marland and he made another suicide attempt.

On October 1 a competency hearing was held and, on the basis of Dr. Strawinsky's report of September 2, the court found Morgan competent to stand trial. But on the issue of mental illness and "productivity," the Assistant United States Attorney informed the court that he had talked to Dr. Marland and Dr. Marland wanted to withdraw his opinion and defer diagnosis. The prosecutor said,

> Their examination was made without any knowledge of the facts of the case except that which the defendant related to them. The examination was made by one psychiatrist, Dr. Marland, *who visited the hospital on one or two occasions* and who has a very busy schedule.

> His opinion was based upon statements made to him by a psychologist and by examining psychiatrists. The report does not substantiate the statement made by Dr. Marland. I have talked to Dr. Marland himself. He has changed his mind—his opinion, excuse me,—he has changed his opinion in the case from what is stated in the letter to "I don't know," and "I want to defer my opinion pending, first of all, a complete analysis because of the severity of the offenses in this case," which was a triple homicide.

> And he would like to know more about the facts of the case, more about the defendant, exactly the information that Mr. Drew and I were about to send him.[13]

---

10. Def. Ex. 15.

11. We have on innumerable occasions indicated that such reports, containing unsupported "conclusory labels," are meaningless for the adversary system. They obfuscate, rather than aid, relevant inquiry. *See, e. g., Washington v. United States,* 129 U.S.App.D.C. 29, 390 F.2d 444 (1967); *Rollerson v. United States,* 119 U.S.App.D.C. 400, 343 F.2d 269 (1964).

12. Def. Ex. 13 and 13a.

13. The prosecutor planned to send a description of the crimes as derived from the police reports. T. 292, 294. By letter of September 1, 1971, Def. Ex. 28, defense counsel Mr. Drew had asked the prosecutor to give him (to be passed on to St. Elizabeths) a sympathy card taken from Morgan's person at his arrest, several suicide notes left by Morgan at his apartment and found by detectives, and any other relevant materials. The prosecutor admitted that defense counsel had also asked for a drawing made by Morgan on the wall of his apartment before the murders, depicting Morgan

Accordingly, Dr. Marland is in the process of withdrawing his opinion, his opinion as stated in the letter of September 2nd.[14]

This statement, it must be noted, contained a contradiction. It lamented first that the September 2 opinion was drawn from only one psychiatrist, and then in the same breath complained that the opinion was based on examinations made by others.

The prosecutor's report was the first indication that either defense counsel Mr. Drew or the court had of Dr. Marland's change of opinion. But both acceded to the request on the basis of only the prosecutor's representations. Drew was not, however, entirely comfortable with the situation. He said:

There is one thing I do want to say, Your Honor. If I receive a report from Dr. Marland of existing mental illness and competency based on the additional information, I don't know, he changes one part and not the other—not changes it but withdraws it—I would like to know if Mr. Morgan is being returned to Saint Elizabeths—whether he is returning for further examination by Dr. Marland or the staff at Saint Elizabeths, and exactly what materials are being submitted to them.

THE COURT: I assume that the materials that are being sent are the materials that you and Mr. Bucklin agree on.

MR. DREW: . . . All I'm saying is that I would like—what I'm concerned about is if Dr. Marland whom I have seen testify and testify often in this court withdraws his opinion in response to a telephone call from the United States Attorney. I don't know whether he should be the one that does the further evaluation.

THE COURT: Well, I assume that probably Dr. Marland is the one who will examine him. And, in addition to Dr. Marland, they probably will have a staff conference, which was not held in this case. Is that true?

THE PROSECUTOR: There will be other doctors. I don't know whether Dr. Marland will participate himself. He may because *he has done an awful lot of work on the case*.[15] His withdrawal or change on it was not due to my telephone call, but mostly due to the psychologist.

THE COURT: We are not going to tell Saint Elizabeths Hospital who to put on this case. I gather that the "once over lightly" deficiency has been recognized and Saint Elizabeths is willing to take him back and do a more thorough job.

Mr. Drew acquiesced, saying, "[A]s I understand it, Dr. Marland is not changing his opinion conversely, but, if I am correct, is withdrawing it possibly to reinstate it."[16]

On October 14, apparently unaware of the extension granted him at the October 1 hearing, Dr. Marland wrote the trial judge requesting additional time to study Morgan. He wrote, "Since my report on Gilbert Morgan, doubts have arisen in my mind. I have seen him three additional times . . . . . There is also a very strong feeling that malingering is involved."[17] This letter was promptly received by the trial judge, whose secretary telephoned Dr. Marland with the message that he could have as much time as he needed. But the letter was not formally filed with the court until January 31, 1972, and defense counsel did not know of its existence until November 30, 1971, when

holding a smoking gun and his family reunited in heaven. T. 296 (References designated "T" are to the transcript of the hearings on October 23, 24, 25 and 30, 1974; references designated "T-2" are to the continuation of the hearings on July 29, 1975, which are separately paginated.)

14. Transcript of October 1, 1971, at 4 (emphasis added).

15. Compare this assertion with the prosecutor's statement, italicized above, that Dr. Marland had only "visited the hospital on one or two occasions."

16. Transcript of October 1, 1971, at 6–8 (emphasis added).

17. Def. Ex. 16.

purely by chance the judge's secretary showed it to him in chambers.

On October 18, the prosecutor wrote a letter to St. Elizabeths describing the crimes and enclosing some of the materials which he and Mr. Drew had discussed. The letter purported to attach some police reports, a sympathy card Morgan had on him at his arrest, and several suicide notes written by Morgan prior to the crime. But in testimony at the remand hearing the prosecutor was very vague about whether he had actually sent the card, the notes, or the drawing Drew had asked for,[18] and none of these items is in the record. (The drawing was made by Morgan on the wall of his apartment shortly before the murders and depicted himself holding a smoking gun and his family standing on a cloud in heaven.)[19] The police reports were enclosed.[20]

The October 18 letter itself was five pages long. It included some information on Morgan's background and extensive descriptions of the crimes. It described in great detail the positions of the bodies, what the wounds looked like, and how much defecation and vomit surrounded the victims. The letter also drew some conclusions about the crimes.[21] Its last paragraph read:

As you undoubtedly realize this case is one of major significance and interest and we would specifically request that in light of the serious charges involving the death of three innocent people that a very careful analysis be made both as to the existence of a mental illness and the

causal relationship, if any, between any mental illness and these offenses. If you desire any further information, please do not hesitate to call and we will be glad to accommodate any such request as soon as possible.[22]

This letter was sent to Dr. Strawinsky with a copy to Dr. Marland. Mr. Drew did not know of its existence until the judge's secretary happened to show it to him in chambers on November 30, 1971.

The prosecutor was scheduled to leave the U.S. Attorney's Office soon and on October 22 he wrote a memo to his successor summarizing the status of his pending cases. About *Morgan* he wrote:

Saint Elizabeths Hospital, through Dr. Marland, originally reported the defendant to be suffering from a mental illness with productivity. Dr. Marland has informed me that he has now changed his opinion and is going to confer with other members of the Hospital staff prior to submitting a revised report. I have serious doubts as to the existence of a serious mental illness and cannot in any way see the issue of productivity being foreclosed from a jury determination. It is my opinion that we should not concede this issue in any event.[23]

On November 1 Dr. Marland wrote his second report, in which he completely reversed his former opinions about Morgan, concluding that Morgan had earlier been deceiving him and was in fact "without mental disease now and at the time of the

---

**18.** T. 294, 296.

**19.** *See* note 13 *supra.* The prosecutor has recently acknowledged that the drawing has been either lost or destroyed. Brief for Appellant at 44, n.**.

**20.** T. 51–53; Def. Ex. 18, 19, 20.

**21.** *E. g.* that the mother-in-law must have been shot while lying on a daybed, that Morgan had twisted his wife's arm behind her back before shooting her, that he had removed her wedding ring from her finger, and that he had stopped

and reloaded his gun during the incident. Def. Ex. 17 at 3–4. It is impossible to know from the record whether these conclusions are accurate, but some of them are contradicted by Morgan's account of the crime. For example, he says that Lisa had left her wedding ring at the apartment when she moved out the day before the crimes, and that he did not reload when his gun ran out of bullets, but rather got a knife from the kitchen. Def. Ex. 36 at 5.

**22.** Def. Ex. 17 at 4–5.

**23.** Def. Ex. 30.

alleged crime." [24] Unlike his first report,[25] the second one took the form of a letter to the trial judge typed on his own stationery. Due to an illness of Dr. Marland's secretary,[26] this letter was not mailed. Some time in late December, the prosecutor, who was already aware that Dr. Marland had found Morgan sane,[27] called Dr. Marland to ask him what had happened to his second report. Dr. Marland then investigated, found the letter, and mailed it. On December 22 the prosecutor informed Mr. Drew of its contents and on January 10 he sent Mr. Drew a copy of it.

On November 30 in the judge's chambers Mr. Drew saw Dr. Marland's letter of October 14 and the prosecutor's letter of October 18 for the first time. It was at this point that he first realized that his client's insanity defense was "in trouble." [28] On December 22, the prosecutor told Drew that Dr. Marland's second report would find no mental illness.

February 2, 1972, was Morgan's twenty-second birthday, the deadline for eligibility for Federal Youth Corrections Act [29] sentencing. Faced with this deadline and the second, Marland report, Mr. Drew, from November 30 on, shifted his defense strategy from an insanity defense to pleading guilty so as to gain for his client the benefits of the Youth Act.[30] On January 21, 1972, Morgan pleaded guilty to three counts of first degree murder, one count of assault

**24.** Def. Ex. 21. The letter read in full:

Subsequent to my earlier report, I reread my notes and the indictment and developed some doubts, therefore, I have continued to examine Gilbert Morgan. Upon going over my notes on August 12, 1971, I noted that he denied a previous statement that he was a diabetic but was taking insulin, 5 units, three times a day to kill himself (a rediculous [sic] statement) repeating a trivially small dose.

He denied he had trouble with other people had only one fight, later admitted that he had many fights, developed quite a reputation as a fighter, admitted that he had a bad temper and lost it easily. He early denied memory of the events preceeding [sic] and surrounding the killings. First refused to discuss many things stating he didn't remember. He was most uncooperative and then each time I saw him he added a little more information. His early explosive and irratic [sic] conduct in terminating the examinations with me was staged. He talked more freely with others. He was reasonably cooperative with Dr. Bauer, psychologist, and Dr. A. White, staff psychiatrist of the Jail. I requested an investigation by the social worker, Miss Cooper. She had no difficulty in getting information that he had told me he couldn't remember.

With me he kept his voice so low it was, at times, inaudible. He gave much information to the ward physician, Dr. Caesar [sic], and in a joint session with Dr. Ceasar [sic] he admitted to me most of the incidents he previously claimed he had forgotten. I do not believe that he had forgotten. I do not believe that he has any loss of memory or amnesia relating to the events of the crime.

While he early had very few close friends he had many acquaintances many girl friends with whom he had sexual relations, a long stormy affair with his wife prior to marriage, many fights before and after marriage. He was bitter against his mother-in-law for her

interference, and as he admitted the tension was building up a long time. He had many violent scenes with his wife admitting blows at least four times, remembers he had brooded and thought about using a gun for some days prior to the final incident. He suspected his wife of having a boy friend and knew she intended to leave him. She had previously done so. This time the furniture had been moved. He consistantly [sic] denied hallucinations.

Mrs. Harrell, a graduate nurse, reported to me that he has hidden many objects in his room probably to indicate that he might use them in a suicidal attempt.

He regrets his actions in the shooting, has a feeling of guilt and is quite depressed over the situation in which he finds himself. This depression has occurred since the incident.

Otherwise I find him without mental disease now and at the time of the alleged crime. He is competent to consult with council [sic] in his own defense.

**25.** *See* text accompanying note 12 *supra*.

**26.** This was the explanation offered by Dr. Marland, Def. Ex. 24 and T. 148, 151–52, and defense counsel never challenged it or inquired about it at the remand hearing.

**27.** T. 147, 153.

**28.** T. 227.

**29.** 18 U.S.C. §§ 5005–26 (1970).

**30.** The Act provides for indeterminate sentencing to special rehabilitative programs for youths under the age of twenty-two at the time of conviction. The sentence may be considerably shorter than an adult sentence would be. 18 U.S.C. §§ 5010(b) and (c), 5017(c) and (d).

on a member of the police force with a dangerous weapon, and one count of carrying a dangerous weapon.

At the plea-taking the trial judge called attention to the two Marland reports and asked Mr. Drew if he challenged the second one's finding of no mental illness and no productivity. Mr. Drew replied, "[W]e are consciously deciding not to challenge that."[31] The judge then thoroughly interrogated Morgan to assure that his pleas were voluntary.

On January 25 Dr. Marland delivered a letter to the court explaining the existence of two reports.[32] He wrote: "My first report on this man was a detailed study intended for the hospital file. This was the first man examined under the Acting Superintendent's request for assistance in lessening the backlog of examinations of men accused of crime. Due to my unfamiliarity with the hospital system, I was surprised to find it had been forwarded as a final report. My last report was the result of careful study of the man and available records."[33]

On January 31, two days before his twenty-second birthday, Morgan was committed under § 5010(e) of the Federal Youth Corrections Act for further study.[34] At that time the judge again asked Mr. Drew if he was satisfied with Dr. Marland's second report. Mr. Drew replied, "[T]he doctor found that there was no mental illness at the time of the offense and there was therefore no productivity and we have specifically and consciously decided to accept that and not to oppose that filing, so we do not plan to present an insanity defense."[35] Morgan was committed to the Medical Cen-

ter for Federal Prisoners at Springfield, Missouri, for evaluation.

On February 23, Morgan arrived at Springfield and on February 28 the prosecutor wrote a letter to the officials there volunteering "certain information to you that may be helpful in rendering a realistic evaluation on this defendant's suitability for your program." It contained a description of the crimes virtually identical to that in the previous prosecutor's letter to Dr. Strawinsky and Dr. Marland.[36] In addition it stated, "These convictions emanate from what was the most vicious case I have had occasion to prosecute." The letter concluded: "Whether Mr. Morgan is a proper subject for treatment and supervision under the Youth Act is a matter for your discretion. I suggest, however, that the scope of brutality involved in these crimes clearly evidences criminal maturity. I hope that the information contained in this letter will be of some help to you in making a realistic determination of this defendant's suitability for Youth Corrections treatment."[37]

In April 1972, the Springfield center made its report,[38] concluding that Morgan would not benefit from Youth Act treatment. It read in part:

The psychological findings indicate that this man is a deeply and chronically disturbed individual and although he is not acutely psychotic, his total personality adjustment is highly tenuous and subject to ready decompensation under the conditions of emotional stress. He is considered to be a continued suicidal risk. The psychiatric diagnosis present [sic]

**31.** Transcript of January 21, 1972, at 2–5.

**32.** Dr. Marland testified that he wrote this letter entirely of his own accord to explain the "asinine" and "stupid" procedure he had used. T. 58–60. The prosecutor testified that he asked Dr. Marland to write the letter. T. 161.

**33.** Def. Ex. 22.

**34.** Section 5010(e) reads:
If the court desires additional information as to whether a youth offender will derive benefit from treatment under subsections (b) or (c) it may order that he be committed to the custody of the Attorney General for observa-

tion and study at an appropriate classification center or agency. Within sixty days from the date of the order, or such additional period as the court may grant, the Division shall report to the court its findings.

**35.** Transcript of January 31, 1972, at 2.

**36.** Def. Ex. 17; *see* text accompanying notes 18–22 *supra*.

**37.** Def. Ex. 26.

**38.** Def. Ex. 48a–d.

schizophrenic reaction, chronic undifferentiated type.

It is the general agreement of all areas of evaluation that a treatment program for this individual would be prolonged and that chances for success are extremely guarded. It will necessitate the use of long-term psychotherapy, perhaps utilizing chemotherapeutic agents with very close consistent controls readily available. The environment in which he is initially placed should not present continual emotional stress and challenge to his already tenuous self-control. A therapeutic correctional environment would appear to be potentially more beneficial than an open psychiatric facility.[39]

This report (henceforth the first Springfield report) ran to more than twenty pages and described the investigation, and the facts and reasoning relied upon. It included a full medical and dental report, education and intelligence testing and history, social data sheet, an elaborate test report from a clinical psychologist, a lengthy report from the chief psychiatrist, and a full staff report with summaries and recommendations.

█ In early May Mr. Drew left the Public Defender Office and Morgan's defense was taken over by Ms. Cohen of that office. When she saw the Springfield report, which had not theretofore been available to her predecessor, she moved in court for a continuance of final sentencing, then scheduled for May 22, in order to discuss with Morgan the possibility of withdrawing his guilty pleas in light of this new evidence of insanity. The following colloquy ensued:

THE COURT: Do you feel you are in any way bound by the action Mr. Drew took since you are employed by the same agency?

MS. COHEN: Your Honor, I think each of us operates as an independent attorney, paid by the same agency.

\* \* \* \* \* \*

MS. COHEN: Your Honor, I also don't feel that had Mr. Drew—or given the fact that Mr. Drew entered a plea of guilty on behalf of this defendant that the defendant does not have an opportunity to withdraw that plea under the Federal Rules of Criminal Procedure, Rule 42 [sic]. He does have to make a motion to withdraw his pleas, and the basis for this motion is information that was not available to Mr. Drew but became available as a result of the 5010(e) study.

\* \* \* \* \* \*

THE COURT: \* \* \* And I should tell you now that I will deny any motion for a withdrawal of the plea, and you may have your exception.

\* \* \* \* \* \*

But I want to state for the record that this is just one more evidence of what I regard as a lack of responsibility on the part of the Legal Aid Agency.[40] A man makes a calculated decision, being fully aware of the possibility of the insanity defense, to plead, and his course of conduct is repudiated by an associate in the same office on the ground that you operate independently and are not bound by the other's representations.

\* \* \* \* \* \*

Let me ask you just one question, you don't have to answer it if you don't want to: Suppose the report in this case, which you have seen, recommended a 5010(b) or (c) commitment, would you still consider the possibility of withdrawing the plea?

MS. COHEN: If the report did not have the psychiatric evidence in it, I would probably not be considering the

---

**39.** Def. Ex. 48a.

**40.** On the contrary, we believe it would clearly have been irresponsible and perhaps violative of the Sixth Amendment for counsel to have done less. *See United States v. Decoster*, 159 U.S.App.D.C. 326, 487 F.2d 1197 (1973); *Unit-*

*ed States v. Washington*, 154 U.S.App.D.C. 246, 475 F.2d 357 (1973); *United States v. Benn*, 155 U.S.App.D.C. 180, 476 F.2d 1127 (1973). *See generally* Bazelon, *The Defective Assistance of Counsel*, 42 U.Cin.L.Rev. 1 (1973).

withdrawal of the plea. I think that if they came back with a 5010(b) or (c) recommendation, it would be because they did not find him mentally ill or did not find the kind of evidence that they found that caused them to recommend against it.

And in the absence of such psychiatric evidence and evidence leading to an insanity defense, there would be no need to withdraw the plea.[41]

Sentencing was held on May 22, 1972, and defense counsel made a motion to withdraw the guilty pleas on the ground that after the pleas were entered, newly discovered evidence had been produced indicating that Morgan had an insanity defense. The court denied the motion, saying that the decision to forego an insanity defense and plead guilty before Morgan's twenty-second birthday was a "tactical decision." He accused defense counsel of trying to retract that decision only after it did not "pan out," referring to the Springfield center's recommendation of an adult rather than a youth sentence. Then, relying on the Springfield

report, the judge imposed an adult sentence of twenty years to life imprisonment and "directed" that Morgan be returned to Springfield "for treatment." [42]

Morgan remained at Springfield until July 1973, when he was transferred to the federal penitentiary at Terre Haute.[43] This transfer was precipitated by a second Springfield report, written in March 1973. In it the staff psychologist wrote of Morgan:

His over-all adjustment has improved considerably and he has reached a point in treatment where he needs to try those behaviors which he has learned through therapy in different situations at another institution. His judgment has improved considerably and his over-all performance has been greatly increased. . . . It is felt that this patient does not need the special psychiatric treatment available at the Medical Center . . . . [A]fter a short time of support he should be able to deal with stressful situations in a realistic manner.[44]

41. Transcript of May 19, 1972, at 6–10.
The trial judge also declared:
I will tell you what you are doing, you are forcing me to impose an absolute rule in the future that no attorneys be permitted to see the 5010(e) report. That rule is in operation for many of the judges. I am never going to let a lawyer see the 5010(e) report. Up until now I have let them do it, but never again.
Id. at 7. This option, which was always questionable, is no longer open to a trial judge. Rule 32(c)(3)(E) of the Federal Rules of Criminal Procedure, enacted in 1975, expressly applies to § 5010(e) studies the disclosure requirements of Rule 32(c)(3).

42. Transcript of May 22, 1972, at 19, 25.

43. A series of internal memoranda and letters from the Missouri facility, which might have shed some light on the decision to transfer Morgan, was unfortunately not investigated by defense counsel at the remand hearing. The documents reveal the following sequence of events. In November 1972 Morgan was still very suicidal. In January 1973 he was much improved and was commended for good work, but on January 23 he made another futile suicide attempt. On February 4 he shaved his head and eyebrows. On March 9, the psychologist reached the conclusion noted in the text and at note 44, infra, that he was ready for regular prison. On April 2, the facility asked

Petersburg prison to take him but Petersburg refused on the grounds that they were overcrowded and Morgan was not suitable for their population. On April 20 Springfield sought to transfer Morgan to Lewisburg but they too refused, saying Morgan's emotional equilibrium was too fragile to survive the pressures there. On May 2 the team in charge of Morgan wrote a superior that they wanted him transferred. On May 9, he threatened a nurse. On May 10 an official at the Bureau of Prisons in Washington wrote: "As Mr. Morgan is creating management problems in the psychiatric area of your facility, you are authorized to transfer him to Terre Haute." On May 14 Morgan was reported to be involved in a "shakedown" of other inmates. On May 16 a memo called him a black power fanatic. On May 17 a memo said he was causing tensions among the patients. On May 24 the hospital requested the court's permission to send Morgan to the prison at Terre Haute. On May 25 Morgan was cited for threatening the staff. On June 1 he was cited for insolence. On July 11 he was transferred to Terre Haute.

All of these incidents are documented in Def. Ex. 47, Morgan's Springfield file.

44. Def. Ex. 50. The full report read:
The patient was admitted to a closed psychiatric ward at which time a mental status examination was completed. The patient is

██ This report was approved by the same psychiatrist who had written in the first Springfield report, by way of arguing against Youth Act treatment, that

a treatment program for this individual would be difficult and have a relatively poor chance of success. Rehabilitation would mean an intensive effort involving a total reconstitution of this man's ego structure. This process would require many years and involve intensive psychotherapy in a milieu of strict controls. Even under the best of conditions, his overall prognosis would be guarded.[45]

In August 1973, this court issued its decision remanding Morgan's appeal to the district court for further hearings on the circumstances underlying his guilty pleas.[46]

In January 1974, this court issued a further opinion enlarging the scope of the remand to permit the district court to reconsider its denial of Youth Act sentencing. This enlargement was deemed necessary in view of the second Springfield report and Morgan's transfer to Terre Haute.[47] On March 18, 1974, the trial judge ordered that a new § 5010(e) evaluation of Morgan be made at Springfield to assist him in reconsidering Morgan's sentence. This evaluation produced, in June 1974, the third Springfield report.[48]

The third Springfield report diagnosed Morgan as "a passive-aggressive personality, aggressive type, with inadequate and explosive features." It concluded, "[A]ny treatment program for this individual

---

oriented to time, place, person and situation. His affect was flat and his mood was depressed. He gave no history or evidence of delusions, hallucinations, autistic thinking, ambivalence, or other psychotic problems. He did indicate some feelings of depersonalization. His judgment was poor and his memory adequate. After further observation on the closed ward he was moved to an open psychiatric setting where he made a marginal adjustment. Since that time he has been involved in counselling and psychotherapy with various staff members on a one-to-one basis. He has expressed strong suicidal tendencies in the past which are now currently in remission. He has participated in small group and community meetings in an active manner. At times during these meetings he has presented a loud, artificial facade to cover up his feelings of unworthiness. In the past he has shown definite signs of a lack of regard as to the future and has given away his personal property. However, he has for the last two months refrained from this behavior and has taken a more realistic look at the future. He currently is employed in the orthopedic shop and his performance has been acceptable. He engages in recreational and leisure time activities on the ward in an active manner. His over-all adjustment has improved considerably and he has reached a point in treatment where he needs to try those behaviors which he has learned through therapy in different situations at another institution. His judgment has improved considerably and his over-all performance has been greatly increased. He has attempted suicidal gestures in the past, however these have ceased altogether and he verbally indicated that he understands that these latter attempts were more of manipulation than actual attempts.

DIAGNOSIS: Personality disorder, inadequate type.

RECOMMENDATIONS:

It is felt that this patient does not need the special psychiatric treatment available at the Medical Center for Federal Prisoners and can be housed in a regular penal institution. He will need support in dealing with his stressful situations upon his arrival in a new environment. However, after a short time of support he should be able to deal with stressful situations in a realistic manner. It is not felt by the staff that he will revert back to his suicidal manipulations. Nevertheless he will need a correctional counsellor to discuss ongoing situations at various times.

45. Def. Ex. 48c. This psychiatrist claimed at the remand hearing that the schizophrenia he had observed in Morgan and reported in the first Springfield report was only the result of the close confinement in which Morgan was being held at the time. T. 567–72, 589. Yet the doctor had submitted a detailed report at the time which did not contain any reference to the confinement factor. Def. Ex. 48. We believe he was barred from introducing this new explanation at the remand hearing for the reasons we set forth in *Williams v. Robinson,* 139 U.S.App.D.C. 204, 432 F.2d 637 (1970) (St. Elizabeths could not reply on new explanations not contained in the contemporaneous hospital records to justify its decision about a patient). Defense counsel cited this case in a timely objection to the doctor's testimony, T. 568–69, 584–85, but the trial court never addressed it.

46. 157 U.S.App.D.C. 197, 482 F.2d 786 (1973).

47. 160 U.S.App.D.C. 278, 491 F.2d 71 (1974).

48. Def. Ex. 51a–c.

would be prolonged, and the chances for success are extremely guarded." [49] The same psychologist who had written the relatively optimistic second Springfield report now wrote: "Since many of these explosive behaviors have been turned inward and have become submerged, it is more of an overwhelming ordeal than initially believed. His over-all prognosis is quite guarded." [50] The recommendation, like that of the first Springfield report, was against youth sentencing.

On August 16, 1974, this court issued an order further clarifying the scope of the remand; the remand hearings were to include "the adequacy and validity" of the Springfield examinations.

■ The remand hearings were finally begun on October 23, 1974, more than fourteen months after we first ordered that they take place. [51] Hearings were held on October 23, 24, 25, and 30, and eleven witnesses testified. At those hearings, Morgan had the benefit of an independent psychiatric consultant who reviewed the various

medical reports and testified on October 30. After the hearings, Morgan sought authorization to have that psychiatrist conduct a full examination of Morgan, pursuant to 18 U.S.C. § 3006A(e)(1). [52] This request was denied by the trial court, but we ordered that such an examination should be conducted. [53] The psychiatrist, Dr. Leon Yochelson, made his report in July 1975 and testified at the concluding segment of the remand hearing on July 29, 1975. He concluded that Morgan suffered from a long-standing mental condition known as borderline state which is characterized by short periods of severe psychosis and certain abnormal symptoms at other times. The doctor found that at the time of the offenses Morgan was suffering from one of these psychotic breaks. [54]

On December 5, 1975, the trial judge made his findings of fact and renewed his denial of Morgan's motion to withdraw his guilty pleas. That denial is now, once again, before this court.

It is necessary to conclude this sorry chronology with two last events. On June 19,

49. Def. Ex. 51a.

50. Def. Ex. 51c.

51. On May 17, 1974, and again on June 14, 1974, we issued orders, *sua sponte,* requesting the trial judge to advise us of the status of the remand. He reported that the period from August 1973 to March 1974 had been filled by preparations for the hearing by both parties, and periodic status calls. The delay from March 1974 to June 1974 was due to the new § 5010(e) evaluation. The hearings were then scheduled to begin on July 29, 1974, but were postponed at the request of defense counsel, who had recently come on the case after the withdrawal of previous counsel. The hearings were then re-scheduled for October 23.

52. 18 U.S.C. § 3006A(e)(1) reads:
Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for an adequate defense may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

53. Order of January 23, 1975.

54. T–2 at 9–21; Def. Ex. 53. Dr. Yochelson's opinion was based on approximately eighteen hours of interviews with Morgan, including one at which sodium amytal was administered, and a one and one-half hour interview with Morgan's mother, as well as study of all the background materials.

A tape-recording of the sodium amytal interview was introduced as Defendant's Exhibit 54, but the government contends in its brief that the tape is not properly part of the record because, while it was marked for identification (T–2 at 98) and discussed (T–2 at 94–100), there is no indication in the transcript that it was ever moved into evidence. However, the tape did arrive here with the other exhibits as part of the record, the District Court's log of exhibits lists the tape as received into evidence on July 29, and the trial judge treated it as part of the record (F.F. at 23). Therefore we have concluded that the tape is part of the record on appeal. *See* F.R.App.P. 16(b); *M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 226 n. 14, 455 F.2d 1289, 1294 n. 14 (1971); *United States v. Kearney,* 136 U.S.App.D.C. 328, 331 n. 4, 420 F.2d 170, 173 n. 4 (1969); *Williams v. Pennsylvania R. R. Co.,* 313 F.2d 203 (2d Cir. 1963); *Hastings v. Reynolds Metals Co.,* 165 F.2d 484 (7th Cir. 1947).

1976, Morgan made yet another suicide attempt, and on June 24 we ordered him transferred from the District of Columbia Jail, where he had been confined during the remand proceedings, to St. Elizabeths Hospital for his own protection. While he was in the District of Columbia General Hospital recuperating from the attempt, Morgan was examined by a psychiatrist who described him as "mentally ill" and "delusional." His diagnosis was "schizophrenia, schizoaffection." [55] But in December 1976 St. Elizabeths returned Morgan to ordinary prison, saying he was recovered.[56]

## II. WITHDRAWAL OF THE GUILTY PLEA

### A. *The Standard for Withdrawal*

█ The Federal Rules of Criminal Procedure provide that after sentencing, withdrawal of a plea of guilty will be allowed only "to correct manifest injustice." [57] Before sentencing, withdrawal will be allowed whenever it would be "fair and just." [58] Appellant Morgan made his motion to withdraw his guilty pleas after he was committed for a § 5010(e) study but before he received a final sentence. The threshold question is whether this was before or after "sentencing" for the purposes of the standards for withdrawal.

The Youth Corrections Act is one of several procedures now available to judges in which sentencing becomes a two-stage process. The defendant is first committed to the custody of the Attorney General for observation and study for sixty days. Then, with the benefit of the information provided by the study, the judge determines whether the defendant would benefit from youth treatment and fixes a final sentence accordingly. Similarly, under 18 U.S.C. § 4208(b), the judge may hand down a provisional sentence and commit the defendant for a three-month study of his suitability for parole. Then, with the benefit of the study, the judge may affirm the provisional sentence, reduce it, or place the defendant on probation.[59] Since the Federal Rules of Criminal Procedure everywhere refer merely to "sentencing," as if this were inevitably a one-stage process, applying the Rules to the statutory procedures has required considerable ingenuity. We held in *United States v. Barker* [60] that the presentencing standard for withdrawal should apply to motions made after § 4208(b) provisional sentencing but before final sentencing, and we discussed there the reasons for policy which supported our decision.[61] The same logic applies to the § 5010(e) procedure and dictates that we apply the "fair and just" standard normally applicable to presentence withdrawal motions to Morgan's motion.[62]

55. Letter from defense counsel to Chief Judge Bazelon, June 25, 1976.

56. See note 105, *infra.*

57. Fed.R.Crim.P. 32(d).

58. *Kercheval v. United States,* 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927); *United States v. Barker,* 168 U.S.App.D.C. 312, 514 F.2d 208, *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975).

59. *See also United States v. Youpee,* 419 F.2d 1340 (9th Cir. 1969) (commitment of juvenile delinquent for study of appropriate final sentence pursuant to 18 U.S.C. § 5034 as it existed before 1974 amendments).

60. 168 U.S.App.D.C. 312, 514 F.2d 208 (1975).

61. *Id.* at 323–24, 514 F.2d 208.

62. *See also* Fed.R.Crim.P. 32(c)(3)(E) (§ 5010(e) study is deemed a *pre* sentence investigation for purposes of the disclosure requirements of Rule 32(c)(3)); *Corey v. United States,* 375 U.S. 169, 84 S.Ct. 298, 11 L.Ed.2d 229 (1963) (notice of appeal may be filed within ten days after first *or* second § 4208(b) sentencing); *United States v. Behrens,* 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963) (under § 4208(b), second sentencing is "sentencing" for purposes of F.R. Crim.P. 43 and 32(a)); *United States v. Fort,* 133 U.S.App.D.C. 155, 409 F.2d 441 (1969) (both the § 5010(e) commitment and the final sentencing are "sentencing" so that defendant may file motion for bail pending appeal and notice of appeal within prescribed number of days after either); *United States v. McCoy,* 477 F.2d 550 (5th Cir. 1973) (declining to decide which standard applies to motion to withdraw made between preliminary and final § 5010(e) sentencing); *United States v. Thomas,* 415 F.2d 1216 (9th Cir. 1969) (presentence standard applies to motion to withdraw made after provi-

## B. The Failure to Allow Withdrawal in the Face of New Evidence

 Although the "fair and just" standard for presentencing withdrawal leaves considerable room for trial court discretion,[63] we have held that prior to sentencing withdrawal should be "freely allowed"[64] and granted "as a matter of course."[65] Nevertheless, a defendant never has an absolute right to withdraw his guilty plea[66] and this court has upheld some denials of motions to withdraw.[67] In addition, as we noted in *United States v. Barker,* the peculiar context of two-stage sentencing injects some special concerns which may militate against allowing a plea withdrawal in a particular case.[68] Nevertheless, the circumstances surrounding Morgan's motion compel us to conclude that the trial court did abuse its discretion in this case.

Morgan sought to withdraw his guilty pleas because he wanted to raise an insanity defense. We have previously said that the concept of responsibility is "one of the major foundations for the structure of the criminal law" and "when there is sufficient question as to a defendant's mental responsibility at the time of the crime, that issue must become part of the case."[69] (In this case we need not reach the issue of the trial judge's duty to raise the insanity question *sua sponte,*[70] because Morgan himself raised it.)

On remand the trial judge found that "Morgan would have had at best a contested insanity defense."[71] This finding profoundly misunderstands the nature of the harm to Morgan: it was precisely this contested insanity defense to which Morgan was entitled. Moreover, the court's finding seriously misconceives the trial court's role. As we held in *Gearhart v. United States,*

> Where the accused seeks to withdraw his plea of guilty before sentencing, on the ground that he has a defense to the charge, the District Court should not attempt to decide the merits of the proffered defense, thus determining the guilt or innocence of the defendant.[72]

In contrast to his reasoning on remand in 1975, the trial judge did not base his 1972 denial of Morgan's motion to withdraw his plea on an evaluation of the insanity defense, for he did not even acknowledge that that was at issue.[73] Rather, he held that Morgan was bound by his tactical choice to seek a youth sentence and to waive his

sional § 4208(b) sentencing but before final one); *Sherman v. United States,* 383 F.2d 837 (9th Cir. 1967) (same); *Callaway v. United States,* 367 F.2d 140 (10th Cir. 1966) (declining to decide which standard applies to motion to withdraw made between provisional and final § 4208(b) sentencing).

**63.** *United States v. Barker,* 168 U.S.App.D.C. 312, 514 F.2d 208 (1975); *United States v. Sambro,* 147 U.S.App.D.C. 75, 454 F.2d 918 (1971); *Everett v. United States,* 119 U.S.App. D.C. 60, 336 F.2d 979 (1964).

**64.** *Poole v. United States,* 102 U.S.App.D.C. 71, 250 F.2d 396 (1957).

**65.** *McJordan v. Huff,* 77 U.S.App.D.C. 171, 133 F.2d 408 (1943).

**66.** *Everett v. United States,* 119 U.S.App.D.C. 60, 336 F.2d 979 (1964).

**67.** *See* note 80, *infra.*

**68.** *E. g.* the fact that after tentative sentencing the defendant is at least aware that probation or a suspended sentence is unlikely; the length of time elapsed between the guilty plea and the

motion to withdraw and any consequent unusual prejudice to the government or the court. 168 U.S.App.D.C. at 324, 514 F.2d at 220.

**69.** *Whalem v. United States,* 120 U.S.App.D.C. 331, 337, 346 F.2d 812, 818, *cert. denied,* 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965).

**70.** *See United States v. Robertson,* 165 U.S. App.D.C. 325, 507 F.2d 1148 (1974); *Whalem v. United States,* 120 U.S.App.D.C. 331, 346 F.2d 812, *cert. denied,* 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965).

**71.** District Court's Findings of Fact filed on December 5, 1975, at 18. (Hereinafter F.F.) At the conclusion of the hearings, the judge expanded on this theme, saying: "[T]hose of us who have had some experience down here know the extreme difficulty of selling an insanity defense of this kind in the case of circumstances as bizarre as these." T–2 at 142.

**72.** 106 U.S.App.D.C. 270, 273, 272 F.2d 499, 502 (1959).

**73.** *See* text accompanying notes 39–42 *supra.*

insanity defense, and he refused to release Morgan from that waiver, no matter how much subsequent disclosures altered the basis for it. Incredibly, the judge accused defense counsel of abusing the criminal justice system by seeking to retract their choice when Springfield recommended an adult sentence.[74]

To the contrary, defense counsel had consistently maintained [75] that she made the motion *not* because the Springfield report recommended an adult sentence, but rather because it *based* that recommendation on a finding of severe mental illness.[76] There was no basis whatever for disbelieving her. In any event, it is clear from the face of the report itself that the recommendation against youth sentencing was premised on the finding of "severe and chronic" [77] mental illness.[78] To accept the report's recommendation against a youth sentence, but ignore the premise on which it was based—

that Morgan was *too ill* to benefit from youth treatment—was unreasonable and logically inconsistent.[79] The Springfield report revealed new evidence of insanity in the face of which Morgan should have been released from his earlier decision. The judge's belief that Morgan's motion was an attempt to "play games" with the court was groundless.[80]

## III. OTHER CIRCUMSTANCES

We turn now to certain events that transpired before the first Springfield report which raise serious questions of improprieties in the conduct of these proceedings. Because we hold that the trial judge erred in denying Morgan's motion to withdraw his plea on the basis of the first Springfield report, we need not engage in speculations about what adverse effect, if any, these events had on Morgan's defense. Nevertheless, they are sufficiently disturbing to warrant discussion.

**74.** The District Court expressed this view on numerous occasions. Transcript of May 19, 1972; transcript of May 22, 1972; T. 463–66; T–2 at 142. *See* text accompanying notes 40–42 *supra*. It is true that the mere fact that a § 5010(e) report comes back recommending an adult sentence is not sufficient by itself to justify withdrawal of a guilty plea. *United States v. Marshall*, 166 U.S.App.D.C. 412, 510 F.2d 792 (1975). But that is not this case. *See* text accompanying note 76 *infra*.

**75.** Transcript of May 19, 1972; transcript of May 22, 1972; T. 465; *see* text accompanying note 41 *supra*.

**76.** *See* text accompanying note 39 *supra*.

**77.** Def. Ex. 48d.

**78.** The District Court made no finding to the contrary; he simply ignored the relationship.

**79.** We have previously noted the critical nature of the sentencing decision, especially for young offenders, and the judge's duty to take a "hard look" at the record before denying Youth Act treatment. *United States v. Dancy*, 166 U.S.App.D.C. 399, 510 F.2d 779 (1975); *United States v. Norcome*, 375 F.Supp. 270 (D.D.C.), *summarily aff'd*, 162 U.S.App.D.C. 99, 497 F.2d 686 (1974). *See also Leach v. United States*, 118 U.S.App.D.C. 197, 334 F.2d 945 (1964) (sentencing judge should use some of the sentencing aids which Congress has provided and the judge may not arbitrarily ignore the data properly obtained thereby).

This duty is heightened by the woeful inadequacy of many § 5010(e) reports. We have held that a § 5010(e) study should be compiled with painstaking attention to accurate and full disclosure of all relevant considerations. *Dancy, supra.* Unfortunately some of the § 5010(e) studies reaching this court have made a mockery of this standard and of the legislative intent. *See, e. g., Dancy, supra; Norcome, supra; United States v. Tillman*, 374 F.Supp. 215 (D.D.C.1974).

**80.** *Cf. Everett v. United States*, 119 U.S.App. D.C. 60, 65, 336 F.2d 979, 984 (1964).

This case is readily distinguishable from the cases the government cites. For example, in *Everett, supra*, we affirmed a denial of a motion to withdraw where the defendant gave no reason for the motion, had no defense he proposed to raise, and admitted his guilt. In *United States v. Needles*, 472 F.2d 652 (2d Cir. 1973), the Court of Appeals for the Second Circuit affirmed denial of a motion to withdraw made because the defendant discovered that the presentence report contained harmful information. In the case before us the information in the § 5010(e) report was more than just harmful to Morgan's hopes for a youth sentence; it was probative of a defense to the crime. Finally our decision today is not inconsistent with our holding in *United States v. Marshall*, 166 U.S.App.D.C. 412, 510 F.2d 792 (1975), that the mere fact that a § 5010(e) report recommends an adult sentence is not sufficient by itself to justify withdrawal of a guilty plea.

## 1. *Ex parte contacts*

One issue we posed in remanding the case was "the influence of ex parte representations or contacts between the U.S. Attorney or other Government officials and the examining staff at Saint Elizabeths." [81] The prosecutor testified that he had "a couple of" telephone conversations with Dr. Marland,[82] one of which he described to the court on October 1, 1971.[83] On October 18, the prosecutor wrote the five-page letter to Dr. Strawinsky and Dr. Marland setting forth the details of the crime and advising them that "the case is one of major significance and interest." [84] Defense counsel did not learn of the contents of this letter until November 30, and then only by chance.[85]

The district court found that these contacts were not intended to improperly influence Dr. Marland's report and had no effect.[86] Even accepting these questionable findings,[87] we can not escape the conclusion that the tone of the October 18 letter is regrettable.[88] In the last paragraph [89] the prosecutor told the doctors how to conduct their examination and urged upon them several irrelevant considerations (the seriousness of the charges and the gruesome nature of the crimes).

■ The potential impropriety of the October 18 letter was compounded by the fact that defense counsel was not informed of its contents. Common notions of fairness suggest to us that communications of this type, which provide the government psychiatrist with information on which he may base his opinion, should be shared with opposing counsel.[90]

■ The best safeguard against unfairness is the establishment of written procedures by which government psychiatric facilities may obtain all relevant information from both sides.[91] As we have noted on other occasions,[92] published rules offer notice, promote uniformity of practice, provide a standard by which individual conduct

**81.** *United States v. Morgan,* 157 U.S.App.D.C. 197, 204, 482 F.2d 786, 793 (1973).

**82.** T. 281.

**83.** *See* text accompanying notes 13–14 *supra*; transcript of October 1, 1971.

**84.** *See* text accompanying notes 18–22 *supra*.

**85.** *See* text accompanying note 28 *supra*.

**86.** F.F. at 19–20.

**87.** One of the Springfield psychiatrists, who received the nearly identical February 28 letter, *see* text accompanying notes 36–37 *supra*, testified: "I tried very hard not to let something like this influence me. . . . I am sure it does influence us to some extent. I mean anything that is inflammatory or potentially inflammatory, you would consider that this was accompanied by three photographs of the victims. . . . I believe they were in color." T. 522–23.

*Cf. Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (before the unconstitutional admission of evidence can be held harmless error, the court must be able to declare a belief that it was harmless beyond a reasonable doubt).

**88.** For the same reasons, portions of the February 28 letter from the prosecutor to Springfield were unfortunate. *See* text accompanying notes 36–37 *supra*.

**89.** *See* text accompanying note 22 *supra*.

**90.** Until the government psychiatrist reaches a diagnosis or while he is in the process of changing his diagnosis, he is a neutral expert acting under court order, and ex parte communications between him and either side would seem to be out of place. The situation changes after the psychiatrist renders a diagnosis, becomes identified as a prosecution or defense witness, and confers with attorneys for that side in preparation for trial.

**91.** The district court found that no rules existed to govern contacts between the psychiatrist and the parties. F.F. at 23. Although no evidence on the point was adduced at the hearing, he also found that there are no rules "because there has never been any need for such rules." *Id.* There was some testimony that St. Elizabeths had in 1971 a procedure by which it sent a form letter to the U.S. Attorney asking for copies of the indictment and a summary of the facts, but no such letter was sent in this case. T. 300, 82–83.

**92.** This is by no means the first time we have urged St. Elizabeths to formulate and disclose rules to govern their activities. *See, e. g., Williams v. Robinson,* 139 U.S.App.D.C. 204, 432 F.2d 637 (1970); *Dixon v. Jacobs,* 138 U.S.App. D.C. 319, 427 F.2d 589 (1970).

may be measured, and tend to be fairer than informal procedures simply by virtue of the attention given to their formulation. Without such rules, attorneys may not know the boundaries of proper advocacy; doctors may receive improper or insufficient information; and appellate courts are left in the untenable position of judging the propriety of conduct on an ad hoc basis, and then trying to assess degrees of prejudice arising from any misconduct long after the fact. Everyone's interests are served by the establishment of regularized procedures.

### 2. The delayed filings

Another disturbing circumstance is the prolonged delays in the filing of Dr. Marland's letters. His October 14, 1971, letter (indicating Marland's doubts about his original diagnosis and his suspicion that Morgan was malingering) was filed on January 31, 1972, and his November 1, 1971, letter (containing his change of diagnosis) was filed on January 21, 1972. Defense counsel learned of the October 14 letter on November 30 and of the November 1 letter on December 22. The district court found that defense counsel decided on November 30 that his insanity defense was in trouble and shifted his strategy to seeking Youth Act treatment.[93] The court reasoned that even if Morgan had known of Dr. Marland's change of diagnosis on November 1, there would not have been time for a full trial with a contested insanity defense before February 2, when Morgan turned twenty-two. Therefore he would have had to make the same Hobson's choice between an insanity defense and a youth sentence, and the late filings did not influence his choice.

It would have been helpful if the court had made a finding as to the possibility of trial between October 14 and February 2, because the October 14 letter would have put Morgan on notice that the November 1 reversal was probably forthcoming. But even assuming that October 14 was also too late to schedule a trial in time, this does not dispose of the problem of late filings. The fact remains that in two instances the defense was deprived of crucial information for six weeks. No one can say with confidence what use Morgan might have made of the information. Moreover, there is a strong indication in the record that the government had the crucial information as early as October 22, two full months before Morgan did.[94]

This combination of defense counsel's ignorance of a medical report due to late filing and the government's advance knowledge of it was one of the factors which we held in *United States v. Henry*[95] deprived defendant of an effective defense. There, in rejecting the government's argument that defendant's failure to raise an insanity defense was a binding tactical choice, we said: "In these circumstances, to hold that the defense 'chose' not to present an insanity defense would further distort our already tortured language."[96]

### 3. Dr. Marland's second report

Dr. Marland's second report, finding Morgan without mental defect, precipitated Morgan's decision to plead guilty rather than present an insanity defense. We find the circumstances surrounding that report profoundly disturbing.

The government argues, and the district court found, that the second report was not affected by the doctor's ex parte contacts

---

**93.** F.F. at 12–13, 21–22.

**94.** On October 22, the prosecutor wrote in a memorandum to his successor that Dr. Marland, "has informed me that he has now changed his opinion . . ." Def. Ex. 30; *see* text accompanying notes 22–23 *supra*. And the successor testified that he definitely knew that Dr. Marland had decided Morgan was sane *before* he talked to the doctor in late December and *before* he saw the November 1

letter. T. 147, 153. The district court made no finding on this point.

**95.** 174 U.S.App.D.C. 88, 528 F.2d 661 (1976) (psychiatric report not filed until day of trial but prosecutor was informed of its results in advance).

**96.** 528 F.2d at 666. *See also Cannady v. United States,* 122 U.S.App.D.C. 120, 351 F.2d 817 (1965).

with the prosecutor and that it was not really a "second" report at all. Rather, the first report was tentative and preliminary and never intended to be seen by the court; the second report was the doctor's final conclusions. The trial court found that the first report was typed on the form for a final report by mistake and subsequently sent to the court without Dr. Marland's knowledge.[97]

Whatever the truth of the matter,[98] it is unclear what basis Dr. Marland had for his second conclusion. The report[99] is very short on analysis. Dr. Yochelson testified that he did not find in it "enough data . . . to justify any change of psychiatric diagnosis"[100] and that the report "shows bias rather than objectivity."[101] Dr. Marland avowedly sought to withdraw his first report so that he could consider the opinions of other doctors and the results of a staff conference.[102] Yet no other doctors were called in;[103] the second report was written entirely by Dr. Marland, based solely on his own observations of Morgan; and no staff conference was ever held.

### 4. The Springfield reports

Since we hold that Morgan must be allowed to withdraw his guilty pleas, we do not reach the question of his sentencing and the adequacy and validity of the three Springfield studies. But they too contribute to the shabbiness of this affair.[104]

## IV. CONCLUSION

■ Six years have passed since Morgan killed his family, and it may now be too late for an effective presentation of his insanity defense. We expect the government to consider the time lapse in deciding whether to initiate a new prosecution of appellant. The government, of course, has the alternative of undertaking civil commitment proceedings under D.C.Code §§ 21–541–55.[105]

---

97. F.F. at 6–7.

98. We can not escape the conclusion that the existence of Dr. Marland's second report has not been satisfactorily explained. The record contains too many conflicting explanations. First, nothing in the report itself indicates it is tentative, Def. Ex. 15, 13, 13a; because it was typed on the form for a final report, Dr. Strawinsky believed it to be final, T. 90, and transmitted it to the court and the prosecutor as such. Def. Ex. 15. Second, prior to October 1, 1971, Dr. Marland told the prosecutor that he had "changed his mind"; he said nothing about the first report being tentative or sent by mistake. T. 44–45; Transcript of October 1, 1971; T. 275; Def. Ex. 30. Third, Dr. Marland wrote the trial judge on October 14 that he needed more time because "doubts have arisen in my mind"; again, he said nothing about being surprised that his first report had been sent to the court. Def. Ex. 16. Fourth, on January 25, 1972, he again wrote to the court, this time explaining that the first report "was a detailed study intended for the hospital file" and expressing surprise that it had been forwarded to the court. Def. Ex. 22. Fifth, at the remand hearing he testified that the first report was intended only to stimulate discussion at a staff conference. T. 25–26, 70.

99. Def. Ex. 21. See note 24 supra.

100. T. 695.

101. T. 694.

102. Transcript of October 1, 1971, at 7.

103. Morgan was interviewed, both before and after October 1, by Dr. Ceaser, a resident in psychiatry, but he had no input into Dr. Marland's second report.

104. See text accompanying notes 38–39, 43–45, 48–50, and notes 43 and 45, supra. We have often decried the woeful inadequacy of many § 5010(e) reports. See note 79 supra.

105. In June, 1976, in the wake of his repeated suicide attempts, we ordered Morgan transferred to St. Elizabeths pending further proceedings pursuant to D.C.Code § 24–302 (1973). In December, 1976, St. Elizabeths returned him to ordinary prison, saying that he had "sufficiently recovered so as not to be in need of further care and treatment in a hospital for mental disorders." The accompanying psychiatric report stated that Morgan showed no signs of depression in recent months and made no mention of any desire to commit suicide.

To our lay eyes, at least, there are several perplexing aspects of this report. First, it finds that Morgan is of above average intelligence. Every other doctor has found him to be of below normal intelligence. Def. Ex. 48a, 48c–d, 51a–c. Second, the doctor states that Morgan told him the complete story of the murders, that the story "was certainly strange," and that "it was amazing" to compare it to that told to Drs. Marland and Yochelson. Yet he gives us no hint as to what Morgan told him or whether

If the government chooses to try Morgan now, the district court should determine whether it is possible to conduct a fair trial at this late date.[106] Four factors enumerated by the Supreme Court should be considered:[107] the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. If the case is to be tried, ways should be considered to structure the trial to minimize the prejudice to appellant.[108]

*Reversed and remanded.*

VAN PELT, Senior District Judge, dissenting:

I have great respect for my two colleagues. Reluctantly I dissent from the conclusion they reach.

Certain facts appear undisputed. Defendant brutally killed his wife, from whom he was then living apart, his baby, and his mother-in-law, and stabbed himself. I will assume it was an attempt to kill himself, although non-fatal self-inflicted wounds leave open the option, within my experience as a lawyer in the defense of murder cases, to claim self defense or that some outsider was responsible.

He was arrested immediately. Counsel was appointed. Defendant was then able to assist his counsel. I conclude that he was then sane and that during the fall of 1971 and early winter of 1972 he was competent to stand trial. When the guilty plea was entered in January, 1972 his counsel stated in substance that they were not challenging the finding of no mental illness. His counsel, whose competence I would evaluate as adequate, realizing the enormity of the crime, concluded to try to secure for defendant, with defendant's full knowledge and approval, the benefits of the federal Youth Corrections Act.

Before defendant's twenty-second birthday, defendant entered a plea of guilty. Later the trial judge concluded he would not extend the benefits of the Youth Corrections Act to defendant and defendant and his counsel became aware that he would be sentenced as an adult.

Thereafter, in May, 1972, counsel, Mr. Drew, left the Public Defender's Office and the case was taken over by Ms. Cohen. She moved for a continuance of the sentencing date of May 22 in order to discuss with defendant the withdrawal of the guilty pleas and the entering of a plea of not

---

it was amazing in its similarity to or difference from the earlier accounts.

Third, the report states, "Generally, his explanation for these [suicide] attempts was that he 'wished to join his family in heaven.' There was no evidence of psychosis . . ." This conclusion is unexplained.

The report concludes that Morgan does not need care because he shows no signs of psychosis. We are reminded of Dr. Yochelson's diagnosis of Morgan as suffering from Borderline State, a condition of brief, severe psychotic episodes when the patient is under stress, and apparent normality at other times. Def. Ex. 53. It is not for us to decide whether Morgan is currently in need of psychiatric care, but we are distressed to find that no two psychiatric reports on this man seem to agree. If the government decides to initiate civil commitment proceedings, we hope that all the reports on Morgan will receive very careful consideration at a full-blown hearing before any decision is reached.

**106.** Speaking for himself only, the writer of this opinion believes that it will not escape notice that the trial judge to whom we remand this case for consideration of this issue and perhaps for trial expressed strong views about the "lack of responsibility" of Morgan's attorneys who filed the motion to withdraw his guilty plea. He also repeatedly refused to allow Morgan to withdraw his guilty plea and go to trial in the face of substantial evidence that Morgan was insane, and therefore not guilty, at the time of the offense. If the government decides to try Morgan, the trial judge may wish to consider whether the appearance of justice might be best served by having any further proceedings in this case occur before a different judge.

**107.** *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The Court was addressing the question of whether a defendant had been denied a speedy trial. While the issue here is slightly different, the same four factors are highly relevant.

**108.** For example, the drawing made by Morgan shortly before the killings, depicting his wife, child and himself (holding a smoking gun) going to heaven together, has been lost. Brief for Appellant at 44, n.**. The trial judge might require the parties to stipulate to its existence.

guilty by reason of insanity. Even Ms. Cohen's motion would seem to assume that in May, 1972 defendant could assist counsel in deciding such an important matter. The refusal by the trial judge of this request has resulted in the litigation now before us.

In our first opinion we unanimously submitted five questions for resolution by the trial judge and remanded the case for that purpose. *U. S. v. Morgan,* 157 U.S.App. D.C. 197, 482 F.2d 786.

Subsequently, on defendant's motion to amend and enlarge mandate on remand, we unanimously enlarged the mandate to allow the trial judge to reconsider his denial of sentencing under the Youth Corrections Act, and to reconsider the motion to withdraw his guilty pleas and to enter a plea of not guilty by reason of insanity. *U. S. v. Morgan,* 160 U.S.App.D.C. 278, 491 F.2d 71. Our opinion concluded with these words:

> Since the hearing we ordered will disclose whether the psychiatrist's "change [of] opinion" was the product of permissible or impermissible factors, it is essential to appellant's decision whether to move first for reconsideration of his sentence or for a withdrawal of his pleas. Of course, neither this court nor the district court would seek to influence appellant's choice but only to insure that it is a knowing and intelligent one.

On August 16, 1974 this panel entered a memorandum order further relating to the scope of the hearing on remand. The hearing ordered was held October 23, 24, 25 and 30, 1974 and July 29, 1975. Findings of fact were filed December 5, 1975. The trial judge in effect abided by his earlier decision not to apply the Youth Corrections Act and not to permit withdrawal of the guilty plea. In effect, he found that any change in the report or opinion of the psychiatrist, a matter referred to in our second opinion, was explainable and was a product of permissible factors. As indicated, the effect of his order was to affirm the sentence previously imposed and deny all relief to the defendant. The matter is now before us on this last ruling.

I conclude that the trial judge has held the hearing which we ordered. He has given consideration to the factors we requested. While he may not have reached the conclusion which members of this panel might have reached on the same facts, it is clear to me that the evidence was conflicting and he reached findings of fact which are permissible under the evidence before him. There is evidence to support his findings of fact. I feel it is comparable to a jury's verdict upon disputed facts. I conclude that in his findings and judgment he reached a permissible conclusion and that his order should be affirmed.

I have long believed that equally important with the principle that no innocent person shall be convicted is the principle that no guilty person shall go free. I also feel that a retrial now after such a long delay is as prejudicial to the Government as to the defendant insofar as availability of witnesses is concerned, and their ability to express opinions upon the sanity issue, although such difficulty is not the reason for my dissent.

### Supplemental Opinion on Suggestion for Rehearing En Banc

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

### ORDER

PER CURIAM.

On consideration of the suggestion for rehearing *en banc* filed by appellee United States of America, and a majority of judges of the Court in regular active service not having voted in favor thereof, it is

ORDERED, by the Court, *en banc,* that appellee's aforesaid suggestion for rehearing *en banc* is denied.

Judges TAMM, MacKINNON, ROBB and WILKEY would grant appellee's suggestion for rehearing *en banc.*

Statement of LEVENTHAL, Circuit Judge as to why he votes to deny rehearing en banc.

This case is so laden with its own particular facts that in my view it falls outside the class of cases in which questions are decided that merit reconsideration en banc.

This is my reaction to the contention that the panel erred in deciding that a key element of the trial judge's ruling was clearly erroneous because there was no basis to disbelieve the statement of substitute defense counsel that she had moved to withdraw the plea of guilty not because the Springfield report recommended against a youth sentence, but because it based that recommendation on a finding of severe mental illness.[1]

If I discern any general problem in this case, it is determining what approach is proper in a trial court when the defense counsel files a motion to withdraw a plea of guilty after learning that the appropriate authority has recommended against the more ameliorative sentence which the defense was seeking. That problem was not before us in our 1975 en banc decision in *United States v. Barker*.[2] That motion to withdraw the guilty plea was made after Judge Sirica had imposed the provisional sentence under 18 U.S.C. § 4208(b), which itself was an automatic maximum and hence neutral, pending the more detailed information to be derived from the study; there was no indication that the motion was ascribable to anything in the nature of the report.

Even so, the *Barker* opinion makes clear the view of this court en banc concerning

the burden on defendant even when the case is in a pre-sentence posture. The movant need not meet the extraordinarily heavy requirement of showing the "manifest injustice" specified by Rule 32(d) for a post-sentence withdrawal of a guilty plea. He is governed by the more lenient standard of showing that withdrawal would be "fair and just."[3] Yet in the absence of violation of Rule 11 or constitutional rights he cannot rely on earlier expressions, that presentence withdrawals should be freely allowed,[4] to the point of claiming a near-automatic right of withdrawal. It is incumbent on defendant to make a substantial showing of possible innocence and reasons for failure to put the defense forward previously. And the determination of what is "fair and just" entails consideration of the extent of delay on the part of defendant. Defendant must "meet exceptionally high standards" when delay has substantially prejudiced the Government's ability to prosecute the case.[5]

In appraising defendant's showing, the trial judge can take into account the consideration that the withdrawal motion may have been caused in material degree by the receipt of an adverse report on the defense application for ameliorative conditions of detention, such as are provided by Youth Corrections Act, or NARA.[6] This kind of disappointment with what will likely be the forthcoming result has some elements of the philosophy that imposes an extra burden for post-sentence motions, for consideration in determining whether it would be fair and just to put the government to a trial in a substantially prejudiced stance.

---

1. The suggestion for rehearing en banc hypothesizes that there was an underlying finding on credibility. But there was no express finding on, say, demeanor. What seems likely is a difference in viewpoint of the significance of the gloss put on the matter by substitute defense counsel.

2. 168 U.S.App.D.C. 312, 322, 514 F.2d 208, 218 (en banc) *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975).

3. *Kercheval v. United States,* 274 U.S. 220, 224, 47 S.Ct. 582, 71 L.Ed. 1009 (1927); *Gearhart v.*

*United States,* 106 U.S.App.D.C. 270, 273, 272 F.2d 499, 502 (1959).

4. *See Poole v. United States,* 102 U.S.App.D.C. 71, 250 F.2d 396 (1957).

5. *See Barker v. United States, supra,* 168 U.S. App.D.C. at 322–326, 514 F.2d at 218–222.

6. So much is acknowledged, implicitly, in the panel opinion of Chief Judge Bazelon, which takes pains to find the district court had no basis for its conclusion on the motivation for the motion.

With the basis standard having been declared in a recent en banc opinion, the issue of particular application does not call out for another en banc at this time.

The Government's suggestion for en banc reconsideration does not develop that it will be substantially prejudiced by a new trial, beyond a bare statement that it should not be required to try defendant "six years after the crimes without all of its evidence and witnesses." As to basic guilt, it is uncontroverted that defendant spontaneously telephoned the police and reported one of the deaths, that the police arrived to find him waving an empty pistol, alone in the apartment with the wife, baby and mother-in-law who had been shot. For the real trial, on the plea of insanity, the burden rests on defendant.

The panel opinion considers whether defendant can now be given a fair trial, and suggests that the remedy may lie in civil commitment proceedings. With all respect, this may not grapple with the hard issues. Civil commitment may not be available if defendant can make a showing of a current condition that is only "borderline," especially since the government has the burden of proof beyond a reasonable doubt. The panel has wisely refrained from ordering dismissal of the indictment.

Any burden put on defendant at trial is largely an outgrowth of his deliberated and tactical waiver, though this is offset in large part because of unexplained delays in advising defense counsel of developments, bearing both on his tactical choice and the possibility of obtaining an expedited trial. As our *Barker* opinion notes, even with a substantial defense of innocence, a guilty plea may be retained when a withdrawal would prejudice the government's ability to make its case after a substantial delay. Although the parallel is not exact, withdrawal may be accompanied by a new trial even though the delay is of such an extent that it would have resulted in dismissal if it had been wholly attributable to the government's actions. *Barker v. Wingo*,[7] in a different but related context, calls for this

kind of difficult balancing. Judgmental decisions may be debated, and some may be erroneous, but this does not demonstrate that the system and rules are defective. Given its factual posture, this case does not call for en banc review.

---

7. 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).