UNITED STATES of America, Plaintiff,

v.

Donald J. TROTT, Defendant.

Crim. A. No. 83–29LON.

United States District Court,
D. Delaware.

March 14, 1985.

---

Richard G. Andrews, and Edmond Falgowski, Wilmington, Del., for plaintiff.

John M. Willard, Wilmington, Del., for defendant.

## OPINION

LONGOBARDI, District Judge.

The issue before the Court is Defendant's motion to withdraw his guilty plea. Having conducted an evidentiary hearing on February 21, 1985, these are the Court's findings of facts and conclusions of law.

The instant motion was presented, tried and argued by self-retained counsel for the Defendant after the Court had allowed the withdrawal of his previous, court-appointed counsel. Defendant cites nineteen separate reasons why the Court should allow him, prior to sentencing, to withdraw his plea.

The allegations have nothing to do with the actual taking of the plea by the Court or the Court's observance of the prerequisites of Federal Rule of Criminal Procedure 11. "We are not making an allegation at this time that the discussions between the Court and the Defendant on the day of the plea was not done with care and discern (sic) as required by (sic) the Court, or it was not in compliance with Rule 11." Transcript ("Tr.") February 21, 1985, p. 154, lines 12–15.[1]

### BACKGROUND

The indictment charges the Defendant with conducting, between September, 1976, and March 21, 1983, a continuing criminal enterprise. Count XII, Superseding Indictment. The first eleven counts of the indictment relate to specific events of "drug dealing" that *in toto* constitute the criminal enterprise charged in Count XII.

On the very morning of trial, after months of preparation, after pretrial evidentiary hearings on suppression motions were heard and decided, after continuances were granted to allow a more generous time for the preparation of his defense, after seven witnesses for the Government in the witness protection program were summoned to Delaware, and after seventy-three jurors were summoned and in attendance, Mr. Trott, through his attorney, requested a side-bar conference before the Court could even commence his initial address to the jury. His court-appointed attorney then presented to the Court six handwritten pages of motions.[2] While the jury waited, the Court addressed each of the motions with the view that regardless of the disposition, they would be addressed again in Mr. Trott's presence once the initial jury orientation had occurred. Tr. January 28, 1985, p. 8, lines 16–25, p. 14, lines 21–24, D.I. 67. The first motion was dated January 23, 1985, and requested a thirty day continuance of the trial. It alleged that the Defendant had retained private

counsel on January 21, 1985, and that his new attorney could not possibly be ready for trial in one week. Two weeks previously, on January 14, 1985, the Defendant "suggested" he might get privately retained counsel. At that time, based on a need for more preparation, the Court granted the Defendant and his counsel another week in which to prepare their case. The Court indicated that the Defendant could not further delay the trial but, if and when a privately retained counsel appeared and requested a continuance of the trial, the Court would rule on the issue. Tr. January 14, 1984, p. 136, lines 18–21.

The Defendant's allegation in D.I. 67 that he had retained counsel was an obvious prevarication. While on January 14, 1985, he said he had funds with which to hire counsel, Tr. January 14, 1985, p. 136, lines 9–13, and while his affidavit under oath, D.I. 67, indicated he had just retained counsel, the fact of the matter was that he had not retained counsel and did not then have in his possession money to do so. Tr. February 21, 1985, p. 61, lines 14–22. (Trott's motion in D.I. 67 alleged there was an attached letter from Joseph Hurley, Esquire, which would allegedly corroborate the retention of counsel. No such letter was attached to the motion and none has since been presented to the Court. Tr. January 28, 1985, p. 8, lines 3–10.) Defendant's motion was denied. Tr. January 28, 1985, p. 5, lines 5–24, p. 15, lines 19–23.

In his second motion presented on the day of trial, that is, the moment before jury selection was to occur, the Defendant moved to dismiss his court-appointed counsel "due to ineffectiveness." The basis for the "ineffectiveness" was Durkin's failure to file motions requested by Trott: motions for severance, dismissal or change of venue based on pretrial publicity, an order requiring that Government witnesses be made available to him for interviews, leave to hire a private investigator, disqualification of this Judge for bias and discrimination,

---

1. Transcripts of various hearings in this case will hereafter be referred to as "Tr., (date of hearing), page and line number."

2. See Docket Item ("D.I.") 67, 68, 69.

the production of statements, confessions, search warrants and affidavits, the results of scientific tests and "Brady" material.

In fact, Durkin had presented the motions on January 21, 1985, and they had been denied. Tr. January 21, 1985, pp. 42–62. The motion also suggested that Durkin was "ineffective" because he had not conferred sufficiently with Trott. Because "ineffective representation" is also a basis for the present motion to withdraw his plea of guilty, the Court will deal with that issue at length later in this opinion. Suffice it to say, however, the record did not then nor does it now support the Defendant's allegation that Durkin had provided ineffective representation. To the contrary, as subsequent events were to reveal, Durkin had been extremely diligent and was well prepared for trial. One further comment about this motion may be illuminating in reference to the Defendant's attempt to make a "record." The motions that the Defendant insisted be presented at the hearing on January 21, 1985, had not been discussed with Durkin prior to that date. That was so very obvious because, in many respects, they were duplicative of what Durkin had already presented. Tr. February 21, 1985, p. 125, lines 23–25, p. 126, lines 1–9. In presenting the motions, the Defendant ignored facts that were known to him personally. For instance, his motion numbered D.I. 69 requested items that had already occurred in his presence on January 21, 1985.

After these motions had been decided preliminarily at side bar, counsel for the Government and the Defendant returned to their counsel tables and the Court began to address the jury. After eight words, Durkin rose again and asked for a side-bar conference. He advised the Court that after telling Trott his motions had been denied Trott told him he was prepared to plead guilty to Count XII.

Up to this point, the jury had waited for at least an hour to get started. The Court addressed them, advised them that legal questions had caused the delay and yet another matter would prevent the start of the jury selection process for some time. This was at 10:55 a.m. At 11:20 a.m., the Court returned and told the jury that the delay would continue. At 12:05 p.m., one hour and ten minutes after the first recess, during which the Defendant discussed his plea with the Assistant United States Attorney and his counsel, the Defendant returned to the court for the entry of his plea. At 12:55 p.m., that process was concluded.

Two days later, the Court received a *pro se* motion from the Defendant requesting that his guilty plea be withdrawn. Shortly thereafter, the Court received two other motions to withdraw the guilty plea, one from Trott's court-appointed counsel (who has now withdrawn from the case) and one from Trott's privately retained counsel, John M. Willard. Mr. Willard argued the motion before the Court on February 21, 1985.

### LEGAL STANDARD

In considering Defendant's motion, the Court must apply the standard for presentence withdrawal of a guilty plea set forth in Rule 32(d) of the Federal Rules of Criminal Procedure. A court may permit withdrawal of a guilty plea before sentence is imposed upon a showing by the defendant of any "fair and just reason." Fed.R. Crim.P. 32(d). The rule incorporates the "fair and just" standard for withdrawal first set forth in *Kercheval v. United States*, 274 U.S. 220, 47 S.Ct. 582, 71 L.Ed. 1009 (1927). In *Kercheval*, the Supreme Court stated: "The court in exercise of its discretion will permit one accused to substitute a plea of not guilty and have a trial if for any reason the granting of the *privilege* seems fair and just." 274 U.S. at 224, 47 S.Ct. at 583 (emphasis added).

The Court's use of the word "privilege" as opposed to "right" suggests the framework in which the withdrawal of a guilty plea must be considered. Although motions to withdraw guilty pleas before sentencing should be construed liberally in favor of the accused, *United States v. Young*, 424 F.2d 1276, 1279 (3d

Cir.1970), there is no absolute right to withdraw a guilty plea before sentencing. *Government of Virgin Islands v. Berry,* 631 F.2d 214 (3d Cir.1980). The granting of a motion for withdrawal is left to the sound discretion of the trial court. *Id.*

In *United States v. Crowley,* 529 F.2d 1066, 1072 (3d Cir.), *cert. denied,* 425 U.S. 995, 96 S.Ct. 2209, 48 L.Ed.2d 820 (1976), the Third Circuit established three relevant factors to be considered in evaluating a presentence motion to withdraw a guilty plea: (1) the defendant's assertion of his innocence; (2) the prejudice to the government that would result from such a withdrawal; and (3) the reasons for requesting withdrawal of the plea. *Id.* at 1072.

The Defendant has asserted his innocence to the charge to which he pled guilty. D.I. 89, ¶ 27(a); Tr. February 21, 1985, p. 29, lines 19–25. However, more than a bare assertion of innocence is required. "Were mere assertion of legal innocence always a sufficient condition for withdrawal, withdrawal would effectively be an automatic right. There are few if any criminal cases where the defendant cannot devise some theory or story which, if believed by a jury, would result in his acquittal." *Berry,* 631 F.2d at 220 quoting *United States v. Barker,* 514 F.2d 208, 221 (D.C.Cir.) (*en banc*), *cert. denied,* 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975). There are cases, however, which demonstrate situations which amount to more than mere assertion of innocence. For example, in *United States v. Roberts,* 570 F.2d 999 (D.C.Cir.1977), the D.C. Circuit allowed withdrawal of a guilty plea where the defendant had protested his innocence from the time of indictment, even to the point of entering an *Alford* plea. In another situation where the withdrawal was permitted, new evidence had arisen between the time the plea was entered and the time of sentencing. *United States v. Morgan,* 567 F.2d 479 (D.C.Cir.1977). On the other hand, in *Government of the Virgin Islands v. Berry,* the Third Circuit refused to allow withdrawal of a plea when the defendant did not proffer any specific defense but merely asserted his innocence. 631 F.2d at 220.

In this case, the Defendant has done little more than make a bare assertion of innocence. On the other hand, he has stated that he told the truth in the January 28, 1985, Rule 11 hearing. Tr. February 21, 1985, p. 32, line 19. At the time of the plea on January 28, 1985, Trott admitted that he committed every element of the continuing criminal enterprise charge. Tr. January 28, 1985, p. 53, lines 1–25, p. 54, lines 1–23. His disagreement with some of the specifics of the Assistant United States Attorney's lengthy summary of what the Government could prove did not amount to a denial of any of the elements of the offense. His protestations were more to scope than to the substance of the elements of the offense. Tr. January 28, 1985, p. 53, lines 22–25, p. 54, lines 1–4, 15–20.

The Court recognizes that a motion for withdrawal is not the time to determine the merits of any proffered defense. *Morgan,* 567 F.2d at 494. And the Court refuses to speculate about the effectiveness of any proffered defense. Rather, the Court's analysis centers on how credible Trott's protestations of innocence really are. For the convenience and accommodation of any number of personal reasons, any defendant can conjure all sorts of defenses and proclaim his innocence but the core issue is how credible those protestations really are. In this regard, the record conclusively demonstrates that Trott's claim of innocence was only raised conveniently since the time he filed his motion to withdraw the plea. From the date of his arrest in August of 1984 up until the very morning of his trial, the Defendant has not protested his innocence but has consistently and diligently negotiated for a plea of guilty and some favored treatment in return for his cooperation with the Government. Tr. February 21, 1985, p. 98, lines 7–13, p. 101, lines 13–18, p. 136, lines 22–25, p. 137, lines 1–15, p. 138, lines 11–25, pp. 139–142, p. 143, lines 1–5. These facts and circumstances cast considerable doubt on the sincerity of

the Defendant's claim that he is innocent. All this Court has before it on the record is the Defendant's repeated assertions of guilt made at the Rule 11 inquiry and his testimony at the February 21, 1985, hearing that unnamed witnesses will exonerate him. In the absence of a more substantive assertion, the Court cannot accept the Defendant's present claim of innocence as sufficient cause to allow him to withdraw his previous admissions of guilt.

The second factor to be considered in a motion for withdrawal is the prejudice to the Government that will result from withdrawal of the plea.

■ Prejudice to the Government inevitably arises when a defendant enters his plea on the day of trial after jurors, witnesses and court personnel are assembled and ready to proceed. *United States v. Crowley*, 529 F.2d at 1072; *United States v. DeCavalcante*, 449 F.2d 139, 141 (3d Cir.1971). In the present case, seventy-three jurors were present and waiting for *voir dire* to begin. In addition, two witnesses in the witness security program had already traveled to Wilmington. One other witness had been transferred from a federal prison in Lewisburg, Pennsylvania, to Wilmington. Tr. February 21, 1985, p. 128, line 23, p. 129, lines 20–22. Special arrangements had been made for five other witnesses protected by the witness security program to attend the trial and for two other prisoners to be transferred to Wilmington to testify. Tr. February 21, 1985, p. 129, lines 1–15, p. 130, lines 1–2. The attorneys for both the prosecution and the defense were ready to proceed.

The Court, in addition, will not treat lightly the real threat of violence that hung like a pall over the pretrial proceedings and which would have been present at any trial of Mr. Trott. The major witnesses who will testify for the Government against Mr. Trott are in the protection of the Government because they fear for their safety. Bringing those witnesses to Delaware exposes them to the "danger zone" from which they have negotiated anonymity, new identities and a new way of life. Tr. February 21, 1985, p. 132, lines 23–25, p. 133, lines 1–11. Obviously, bringing them here on more than one occasion only heightens the risk to their personal safety and to those innocent Government employees who are charged with their safety. It also creates a need for serious and costly protective measures to ensure their safety. Tr. February 21, 1985, p. 133, lines 5–10. The recital of these details is not pure speculation. Trott himself has alluded to such risks when he testified to his being a possible witness against the Pagans. Tr. February 21, 1985, p. 57, lines 10–14, p. 67, lines 22–25, p. 68, lines 1–3. To require the Government to begin all over again in assembling these witnesses and preparing for trial would be unfair and prejudicial.

Finally, the Court must consider the reasons the Defendant has offered for withdrawal of his guilty plea. He claims withdrawal should be allowed for a number of reasons. He first contends that his emotional state was such at the time of the plea that he did not plead voluntarily. The "strain, stress, duress and pressure" arose from: (a) a heart attack two years previous that left him with "bad nerves"; (b) the loss of his wife on September 7, 1984; (c) his confinement in a maximum security prison in which he gets one hour per day for recreation; (d) his lack of contact with people; (e) his fears for his safety while confined based on an incident in 1976 [3] while a prisoner in Danbury; and (f) his cell was flooded one time in the recent past. Tr. February 21, 1985, pp. 6–9. As a result of all these things, he was a "nervous wreck." Tr. February 21, 1985, p. 8, line 14.

His description certainly does not describe the person who appeared before this Court on January 28, 1985. This Court observed the Defendant while seated with his counsel and noted the command he had

---

**3.** Although Trott testified that the incident occurred in 1976, Tr. February 21, 1985, p. 7, line 10, it appears that he was not convicted and sentenced to federal prison until 1977. Tr. February 21, 1985, p. 63, line 13.

of the situation before the trial started, advising his attorney of his pretrial *pro se* motions and his response when Durkin advised him his motions had been denied. His demeanor thereafter was one of a calm and mentally alert person who knew exactly what was transpiring. He was so alert during the Rule 11 inquiry that he even advised his counsel that a question from the Court was not addressed to him but to his attorney. Tr. January 28, 1985, p. 55, lines 13–20. There was not an instance during the fifty minutes when he was not articulate and intelligently responsive to all the questions from the Court. He never had to ask the Court to explain a word or term used by the Court. Admittedly, he said he had a migraine headache. Tr. January 28, 1985, p. 36, lines 14–15. But the Court offered him a recess, some respite, a glass of water and he refused. Tr. January 28, 1985, p. 36, lines 16–24.

The Court's conclusions about the Defendant's mental state were also those of his attorney and Lewis W. Hyden, II, an F.B.I. Special Agent. Tr. January 28, 1985, p. 55, lines 6–24; Tr. February 21, 1985, p. 145, lines 13–25, p. 147, lines 22–25, p. 148, lines 1–6. This conclusion persists notwithstanding the testimony of Jackie Christian, a witness for the Defendant who testified that Trott did not seem himself that day. Christian testified that he was surprised at the Defendant's plea of guilty. Tr. February 21, 1985, p. 83, lines 12–19. His testimony is rejected because it does not provide any objective basis for describing Trott's mental state that day. To say that "it just wasn't him" because of the way Trott was "standing and listening" is purely conclusory. This is especially true in light of the testimony of other witnesses who had more interaction with Trott on the day of the plea than did Christian. Indeed, the Defendant's back was to Mr. Christian during the whole process.

Paragraph 8 of Defendant's motion to withdraw his plea indicates he was rushed into pleading guilty and that he had "inadequate time to consider the bargain prior ..." to entry of the plea. He also alleges the time spent discussing the plea that

morning went like a "flash" and he did not understand any discussion of the plea by his lawyer or by the Assistant United States Attorney. Tr. February 21, 1985, p. 11, lines 3–25. The allegations are incredible in light of the testimony that was developed during the hearing on February 21, 1985. F.B.I. Special Agent Hyden testified that he knew Trott before he was arrested in August, 1984. Tr. February 21, 1985, p. 136, lines 9–11. Shortly after his apprehension, Hyden had an occasion to talk to Trott that lasted for about forty-five minutes. Tr. February 21, 1985, p. 136, lines 16–17. During that discussion, Trott did not protest his innocence but rather offered his services in return for a plea which would minimize his expected incarceration. Tr. February 21, 1985, p. 137, lines 3–15. Shortly thereafter, Trott's first attorney initiated plea negotiations. Tr. February 21, 1985, p. 138, lines 11–25, p. 139, lines 1–6. In discussions with Durkin, his subsequently court-appointed counsel, the Government reiterated its position that the only plea that would be accepted was a plea to the charge to which he finally pleaded guilty. Tr. February 21, 1985, p. 139, lines 10–14, p. 141, lines 9–16. As a matter of fact, the plea offer that was finally accepted by Trott was the only plea offer extant since at least November 5, 1984. Tr. February 21, 1985, p. 101, lines 19–25. The Court accepts that as fact. In addition, Durkin revealed that he spent over an hour with Trott on Friday, January 25, 1985, explaining to him the very plea offer which he accepted on January 28, 1985. Consequently, even if Trott had forgotten all that had previously transpired, he still had the balance of Friday, all of Saturday, all of Sunday and Monday morning to think about this plea. Tr. February 21, 1985, p. 104, lines 7–25, p. 105, lines 1–14.

■ Under these circumstances, the Court rejects Trott's contention that this plea was foisted on him with insufficient time to reflect on its implications. The Court finds that the plea of guilty entered on January 28, 1985, was entered after months of serious deliberations by Trott

with the aid of Durkin and of his previous, privately retained counsel, Jeffrey C. Zucker.

Paragraphs 9, 10, 17 and 23 of Trott's motion to withdraw allege he was inadequately represented by his court-appointed attorney, that he wanted to obtain a "competent legal advisor" and that he was unable to communicate efficiently with his counsel, all of which prevented him from knowingly, intelligently and voluntarily entering his plea of guilty.

The record does not support any of these contentions. The Court finds that Durkin's representation in no way affected the Defendant's ability to knowingly, intelligently and voluntarily enter a plea. Durkin is a member of the Pennsylvania and Delaware bar and has been practicing law in Delaware since 1968. Tr. February 21, 1985, p. 91, lines 5–10. He was a former Deputy Attorney General. He was appointed to represent Trott on November 5, 1984, and from that very first day, met with Trott on nine separate occasions. Tr. February 21, 1985, p. 121, lines 11–25, p. 122, lines 1–12. He communicated with Trott by letter on at least twelve occasions. Tr. February 21, 1985, p. 122, lines 17–25. And in his thoroughness "boxcarred literally all of the discovery materials down in shifts for him to read." Tr. February 21, 1985, p. 126, lines 7–9. (And Trott had no trouble reading and understanding the material. Tr. February 21, 1985, p. 126, lines 19–25, p. 127, lines 1–7.) Furthermore, Durkin's affidavit concerning the services rendered in this case demonstrates an unusual diligence and devotion to his duties. In all, he spent 209.25 hours on the case between November 5, 1984, the day of his appointment, and January 27, 1985, the day before the scheduled trial. Court's Exhibit # 1. (A copy was used because the Court would require the original to be submitted to the Third Circuit for Durkin's fee application.)

The expenditure of such time was necessary to digest the tremendous volume of discovery material which included a number of surreptitiously taped conversations of allegedly inculpatory conversations, the typewritten transcripts of those tapes and a tremendous volume of other discovery material. In all, the Assistant United States Attorney described the material as so extensive that if it were "stacked in a pile", it would be at least two feet high. Tr. January 14, 1985, p. 134, lines 20–25, p. 135, lines 1–4.

To get a fuller appreciation of the more than adequate representation rendered by Durkin, one need only read his entire testimony rendered on February 21, 1985. The Court accepts that testimony. Indeed, Trott himself acknowledged that Durkin "did a fine job as any attorney" at the Rule 11 inquiry. Tr. January 28, 1985, p. 56, lines 11–25. His later allegation that he was forced to state that Durkin's representation was adequate is not credible in light of the testimony of Agent Hyden and Trott's own demeanor at the Rule 11 inquiry. At that time, Trott stated without hesitation that he was satisfied with Durkin's representation and that he was not entering a plea because of any dissatisfaction with Durkin. Tr. January 28, 1985, p. 56, lines 9–10, 25.

 The Court finds nothing in the record to suggest that Durkin's representation of Trott was inadequate. The proper standard for attorney performance is that of "reasonably effective assistance." *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). As the foregoing discussion indicates, Durkin's expenditure of time and effort on Trott's defense clearly meets and surpasses any reasonableness standard.

The Court also rejects Trott's allegation that his inability to communicate with Durkin made it impossible for him to knowingly and voluntarily enter a plea. Durkin was certainly articulate. Trott himself was articulate and had absolutely no difficulty in either understanding or communicating with the Court, with the Assistant United States Attorney or with his counsel. On February 21, 1985, the day of the evidentiary hearing on his motion to withdraw, he was the same. Durkin indicated he had no trouble communicating with Trott or Trott

with him. Tr. February 21, 1985, p. 123, lines 10–17. The same can be inferred with regard to all his conversations with Hyden. Considering all of the above, the Court concludes that the Defendant's allegations that he was unable to communicate with his counsel are groundless and without support in the record. The Court further finds from personal observation and otherwise that Mr. Durkin's representation did not impair Defendant's ability to enter a knowing, intelligent and voluntary plea.

Paragraphs 12, 13, 15, 19, 20 and 21 of Defendant's motion to withdraw center around the assertion that he did not understand the nature of his plea, the waiver of his rights or the severity of the sentence on the charge to which he pled guilty. As already discussed, there was nothing in Mr. Trott's physical appearance or activities on the day of the entry of the plea that led the Court, or any other participant in the proceedings, to believe that Trott did not understand what was going on.

Indeed, it is likely that Trott had a better than average understanding of the nature of the proceedings. Trott has entered guilty pleas on two other occasions, one in 1977 and one in 1980. He specifically recalled the entry of the 1977 plea and the judge's explanation of the meaning of that proceeding and the waiver of rights involved. Tr. February 21, 1985, p. 65, lines 7–25, p. 66, lines 1–17.

Further, Defendant's assertions of confusion completely contradict his own statements at the Rule 11 inquiry and the testimony of witnesses present with him on the day the plea was entered. At the Rule 11 inquiry, Trott acknowledged that his counsel had explained the nature of the charge to which he was pleading and that he was familiar with the indictment. Tr. January 28, 1985, p. 27, lines 4–14. He also admitted awareness of his fifth and sixth amendment rights and expressed the understanding that the entry of a guilty plea was a waiver of those rights. Tr. January 28, 1985, pp. 27–30. At no time during the Rule 11 inquiry did Trott give any indication whatsoever to the Court that he did

not know exactly what he was doing or that the waiver of his rights was not voluntary.

■ In addition, Trott expressed understanding of the nature of the plea agreement. He stated that he had read the document and that the Assistant United States Attorney had read the document with him. He also expressed an understanding of the possible sentence that he could receive. In fact, he was so cognizant of the events taking place that he stopped the Court to clarify a point about sentencing. Tr. January 28, 1985, p. 33, lines 8–10. The Court then offered to answer any questions Trott might have about the sentence but no questions were asked. Tr. January 28, 1985, p. 33, lines 18–21. When questioned about whether he knew that absolutely no sentencing recommendation would be binding on the Court, he expressed understanding. Tr. January 28, 1985, p. 35, line 13.

Testimony at the hearing on February 21, 1985, further indicated that Trott's entry of the plea was done voluntarily, with a full understanding of his rights, despite Trott's own self-serving assertions that he did not understand the plea agreement and he did not intend to waive his rights. However, when taken in context, his statements are bare assertions without any basis in fact. Durkin testified that prior to the taking of the plea, he went over the questions asked in the Rule 11 inquiry with Trott to ensure that he realized the consequences of the entry of the plea. In response, Trott expressed his understanding of all portions of the inquiry. Tr. February 21, 1985, p. 112, lines 5–14. Durkin testified, "He never evidenced any problem of understanding or use of words or anything of that sort." Tr. February 21, 1985, p. 113, lines 2–3.

Agent Hyden of the F.B.I. was also present when the plea agreement was initially explained to Trott. He testified that after the agreement was read, Trott indicated that he understood and that he had no questions. In fact, Agent Hyden testified that after the agreement was read

Trott replied, "let's go for it, or something to that effect." Tr. February 21, 1985, p. 145, lines 13–24. Hyden further testified that after the plea agreement was signed, Trott became more amicable and visibly relaxed. Tr. February 21, 1985, p. 148, lines 1–6.

Such testimony corroborates Trott's answers given at the Rule 11 proceeding. Thus, the Court finds that there is no basis in fact for Trott's allegations that he did not understand the nature of the plea agreement, the possible sentence or the waiver of his fifth and sixth amendment rights.

██ In paragraphs 24 and 25 of the Defendant's motion to withdraw, he alleges that the entry of the plea was not voluntary because it was entered pursuant to promises and threats made to him by Special Agent Lewis W. Hyden of the F.B.I. Once again, the Defendant's own testimony at the Rule 11 inquiry and the testimony of other witnesses at the hearing on the motion to withdraw refute his allegation. At the Rule 11 inquiry, when asked whether any threats or promises had been made to induce him to enter the plea, Trott replied in the negative. Tr. January 28, 1985, p. 36, lines 1–11. Later, when he decided he wanted to withdraw the plea, he stated that Agent Hyden had promised him favorable placement within the prison system if he pled guilty. Tr. February 21, 1985, p. 24, line 13. Agent Hyden refuted this allegation with testimony that he had made no promises to Trott. Hyden merely told Trott that if he entered a plea, he would contact an agent of the F.B.I. in Philadelphia where Trott had additional charges pending and have the agent contact Trott about the possibility of cooperation with the United States Attorney for the Eastern District of Pennsylvania. Hyden told Trott that if the United States Attorney in Philadelphia wanted to use him as a witness, he could be placed in a witness protection unit within the bureau of prisons. Tr. February 21, 1985, p. 142, lines 1–8. Trott's own testimony concerning this incident corroborates the fact that Hyden never stated that

he could "guarantee" such placement. Tr. February 21, 1985, p. 23, lines 24–25. No other promises were made. Hyden did not threaten Trott with incarceration in a maximum security prison in Atlanta. Hyden merely indicated to Trott that he could expect to do time in a "hard time prison." Tr. February 21, 1985, p. 148, line 17. Such a statement was not a threat but rather an observation given to Trott in an open discussion of his "options." Tr. February 21, 1985, p. 149, lines 7–10. The Court accepts Hyden's version of the facts and rejects Trott's version in its entirety.

Finally, the Defendant contends that he should be allowed to withdraw his plea because the Government has violated the plea agreement by moving to forfeit Defendant's property when it had promised that none of Defendant's property would be forfeited as a result of the plea. This allegation arises from the fact that on February 8, 1985, Trott received a letter informing him of the possible forfeiture of a Winnebago motor home which Trott claims he owns although the title for the vehicle is not in his name. This contention has no merit in light of the Government's representation that if Trott can show that the Winnebago is his vehicle, the Government will not proceed with the forfeiture. Tr. February 21, 1985, p. 174, lines 15–19. At this time, the Government has no conclusive proof that the vehicle belongs to Trott so they have done nothing to violate the plea agreement.

## CONCLUSION

The reasons set forth by the Defendant as to why he should be permitted to withdraw his plea do not meet the standard set forth by the Third Circuit in *Crowley*, 529 F.2d 1066. The Defendant has offered little more than a bare assertion of innocence as a justification for withdrawal. On the other hand, the Government has demonstrated that it will be substantially prejudiced if withdrawal is permitted. In addition, as the previous discussion indicates, the Defendant has advanced absolutely no

persuasive reasons as to why his plea should be withdrawn.

Finally, and perhaps most importantly, this Court finds that withdrawal is not merited in light of the thorough Rule 11 examination conducted before the acceptance of the Defendant's plea. Rule 11 provides for the placing of plea agreements in the record, for full inquiry into the voluntariness of the plea, for detailed advice to the defendant concerning his rights and the consequences of his plea and for a determination of the defendant's understanding of the charge and the plea. "Given the great care with which pleas are taken under this revised Rule 11, there is no reason to view pleas so taken as merely 'tentative' subject to withdrawal before sentence...." *Comment* to Fed.R.Crim.P. 32(d).

> Were withdrawal automatic in every case where the defendant decided to alter his tactics and present his theory of the case to the jury, the guilty plea would become a mere gesture, a temporary and meaningless formality reversible at the defendant's whim. In fact, however, a guilty plea is no such trifle but "a grave and solemn act," which is "accepted only with care and discernment."

*U.S. v. Barker*, 514 F.2d at 221, quoting from *Brady v. U.S.*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970).

The very purpose of the Rule 11 inquiry is to thoroughly guarantee that when a defendant enters a plea of guilty he is fully apprised of the nature of the charge and the consequences of the plea. The inquiry ensures that such understanding is demonstrated by the record so that a defendant, dissatisfied with his decision to enter a guilty plea, cannot easily ignore the importance of the decision and change his mind on the slightest whim. The goals of Rule 11 are clearly undermined when a mere assertion of confusion by a defendant with little basis in substantive fact is allowed to defeat a properly entered plea. Thus, the extent of the Rule 11 inquiry must be an important consideration in determining whether a defendant may withdraw his plea. *United States v. Strauss*, 563 F.2d 127, 131 (4th Cir.1977).

In the present case, the Defendant did not equivocate, express confusion or a reluctance to enter a plea of guilty throughout the entire Rule 11 inquiry. As both the previous discussion and the record indicate, the Defendant was thoroughly questioned on the state of his physical and mental condition and on his understanding of his rights, the nature of the charge to which he pled guilty, the plea agreement itself and the sentence to which he could be subjected. Never during the entire course of the inquiry (which lasted nearly an hour) did the Court get even the slightest indication that the plea should not be entered. To allow the withdrawal of this plea would make a mockery of the judicial proceedings that occurred on January 28, 1985 and undermine the integrity of the Rule 11 inquiry. Under all of these circumstances, it would not be fair and just to allow the Defendant to withdraw his plea of guilty. His motion is denied.