Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/15/2016 09:06 AM CDT

State of Nebraska, appellee, v.
Joshua D. Carr, appellant.
___ N.W.2d ___

Filed July 15, 2016.    Nos. S-15-921, S-15-922.

1. **Pleas: Courts.** A trial court has discretion to allow defendants to withdraw their guilty or no contest pleas before sentencing.
2. **Pleas: Appeal and Error.** An appellate court will not disturb the trial court's ruling on a presentencing motion to withdraw a guilty or no contest plea absent an abuse of discretion.
3. **Pleas.** When a defendant moves to withdraw his or her plea before sentencing, a court, in its discretion, may sustain the motion for any fair and just reason, provided that such withdrawal would not substantially prejudice the prosecution.
4. **Pleas: Proof.** A defendant moving to withdraw his or her plea before sentencing has the burden to show the grounds for withdrawal by clear and convincing evidence.
5. **Pleas: Evidence.** Newly discovered evidence can be a fair and just reason to withdraw a guilty or no contest plea before sentencing.
6. ____: ____. If a defendant moves to withdraw his or her plea because of newly discovered evidence, the court must consider the credibility of the newly discovered evidence.
7. **Pleas.** To support a finding that a defendant freely, intelligently, voluntarily, and understandingly entered a guilty plea, a court must inform a defendant about (1) the nature of the charge, (2) the right to assistance of counsel, (3) the right to confront witnesses against the defendant, (4) the right to a jury trial, and (5) the privilege against self-incrimination.
8. ____. To support a finding that a defendant freely, intelligently, voluntarily, and understandingly entered a guilty plea, the record must show a factual basis for the plea and that the defendant knew the range of penalties for the crime charged.

9. **Pleas: Right to Counsel.** A court's failure to inform a defendant of the right to assistance of counsel does not necessarily render the plea invalid if the defendant was actually represented by counsel.

Appeals from the District Court for Lancaster County: Steven D. Burns, Judge. Affirmed.

Sarah P. Newell, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, Cassel, and Kelch, JJ.

Connolly, J.

## SUMMARY

Joshua D. Carr argues that the court abused its discretion by not allowing him to withdraw his guilty and no contest pleas before sentencing because of newly discovered evidence. After the court accepted Carr's pleas, he deposed a previously unknown witness whose testimony, Carr contends, would impeach the State's witnesses. The court overruled Carr's motion to withdraw his pleas because it determined that the newly discovered evidence did not exculpate Carr and was not credible. We conclude that the court did not abuse its discretion, and we therefore affirm.

## BACKGROUND

In 2014, the State filed two informations against Carr. In case No. S-15-921, the State charged Carr with robbery and use of a firearm to commit a felony for events occurring on September 11, 2014 (the robbery case). In case No. S-15-922, the State charged Carr with first degree murder, attempted robbery, possession of a stolen firearm, and two counts of use of a firearm to commit a felony (the homicide case). The State

alleged that the homicide case arose from the robbery and death of Maurice Williams on August 30, 2014.

Carr and the State reached a plea agreement. He pleaded guilty to the robbery charge in the robbery case, and in exchange, the State dismissed the use of a firearm charge. In the homicide case, Carr pleaded no contest to an amended information charging him with attempted robbery, use of a firearm to commit a felony, and manslaughter.

Before accepting Carr's pleas, the court received a factual basis for the charges. For the robbery case, the prosecutor stated:

[O]n Thursday, September 11th, 2014 at approximately 2:00 a.m., three male individuals contacted the residents of an apartment [on] Huntington Avenue, Lincoln, Lancaster County, Nebraska, at the front door. The three individuals said they were looking for a place to "cool out."

After a short period of time, one of the three individuals pulled out a black semi-automatic handgun and asked where the marijuana was. As one individual pointed a gun at and threatened the individuals in the apartment . . . the other two searched the apartment and collected [cash and personal property].

A person who was in the apartment during the robbery identified the three male individuals responsible as . . . Carr, Micheal [sic] Nevels and Jomarcus Scott.

[Later], law enforcement contacted . . . Carr and . . . Scott and they located a . . . handgun during the search of . . . Scott. . . . Scott admitted to the robbery at [the apartment on] Huntington with . . . Carr and . . . Nevels.

The State gave the following factual basis for the charges in the amended information in the homicide case:

[O]n Saturday, August 30th, 2014 at approximately 1:03 a.m., Lincoln police officers were sent to [an apartment on] "R" Street, . . . Lincoln, Lancaster County, Nebraska. [Persons] reported that . . . Williams had been shot. Law

enforcement and emergency personnel found . . . Williams lying on the floor inside the residence. He was found to have sustained a single gunshot wound.

He was transported to Bryan LGH West Hospital and soon thereafter pronounced dead. The cause of death was determined to be from the single gunshot wound.

. . . Carr was identified as a suspect when a witness reported to law enforcement that . . . Carr had stated he shot . . . Williams with a rifle during a robbery attempt. A rifle . . . was sent to the Nebraska state laboratory, along with a bullet recovered from [the apartment on] "R" Street, and the items were found to be a ballistic match.

The laboratory located a fingerprint on the rifle that matched . . . Carr's left middle finger. Law enforcement located a photograph on social media as well as on . . . Carr's phone depicting . . . Carr holding the rifle.

Several individuals agreed to law enforcement interviews after August 30th, 2014. From these interviews, law enforcement learned that . . . Carr and three others planned to rob . . . Williams of marijuana and money. They rode together in a vehicle to [the apartment on] "R" Street.

Once there, one of the four made the secure residence accessible, and . . . Carr and another went into the residence. . . . Carr had the rifle and held . . . Williams . . . at gunpoint while the other person looked for money in the bedroom. . . . Williams was heard to say to . . . Carr that they "weren't going to do him like that." As Williams attempted to walk past . . . Carr and toward the bedroom, the rifle discharged and a bullet struck . . . Williams, fatally injuring him.

. . . Carr and the other person then quickly left the residence, got into an awaiting vehicle occupied by the two others involved in the planning of the robbery and left the area.

During driving away from the scene, . . . Carr was reported to have said he thought he shot him. In the days after the shooting, . . . Carr told others that he had in fact shot . . . Williams during a robbery attempt and that he would take responsibility for it. Approximately one week after the shooting, . . . Carr gave the rifle to a friend on the promise of $100. The friend placed the rifle in a closet at a St. Paul residence, where it was located by law enforcement . . . .

A few days before the sentencing hearing, Carr moved for a continuance. His attorney said that the State had informed her that "new potentially exculpatory information had surfaced from a previously unknown confidential informant." Carr's attorney said she needed more time to locate and depose the informant. The court continued the sentencing hearing.

A few days before the rescheduled sentencing hearing, Carr moved to withdraw his pleas in both cases because of newly discovered evidence. At the hearing on his motion to withdraw, Carr offered the deposition of Traeshawn Davis, the previously unknown witness.

Davis testified about two statements: one made by Jomarcus Scott and another by Carr. Davis said that in September 2014, Scott asked him for a ride "out of town." Davis testified that Scott had "blood on his T-shirt and his basketball shorts." He asked what had happened, and Scott told him "'we fucked up, we fucked up, we fucked up, he's dead.'" Davis asked who was dead, and Scott said "'Mo.'" According to the affidavit of Carr's attorney, Davis knew Williams as "Mo."

Davis was "pretty certain" his conversation with Scott occurred in September 2014. Davis remembered having a welfare appointment for his son around September 16 and stated, "I was already saying, you know, it's like not even two weeks away that we got to go for his [son's welfare] appointment." Davis denied that his conversation with Scott could have occurred in August.

Davis also testified about an interaction he had with Carr. In July 2015, law enforcement arrested Davis on an unrelated matter and placed him in the same "Pod" of the county jail as Scott. Davis and Scott quarreled, so Davis moved to a different pod, which happened to hold Carr. After Davis told his pod mates why he had moved, Carr shared with him paperwork related to the shooting of Williams so Davis could "see everything that [Scott] said."

Later, Davis said that he, Carr, and other inmates were playing cards when an inmate commented that Williams' death was "messed up." Carr replied, according to Davis, "'honestly, you know, it is what it is. I just wish it wouldn't have happened like that, but I wasn't the one who pulled the trigger first.'"

At the hearing on Carr's motion to withdraw his pleas, the court also received an affidavit signed by his attorney. Carr's attorney stated that "[t]he State's case in both prosecutions is based primarily on cooperating witnesses, none of which [sic] indicated that . . . Scott was involved in [Williams'] homicide."

Carr's attorney also questioned the veracity of Davis' testimony about the statement Carr made while playing cards in jail. She averred that she had spoken with another inmate who was in the same "grouping" as Carr at the county jail. The inmate could not recall Carr's making the statement attributed to him by Davis. To the contrary, the inmate said that Carr had "always maintained his innocence." For example, when another inmate suggested that Carr had killed Williams, Carr responded, "'Man, did I ever say I did it?'" Carr's attorney further stated that the security manager at the jail told her that Davis and Carr were not released from their cells at the same time, but that Davis could have eavesdropped on Carr's conversations from a nearby cell.

The court overruled Carr's motion to withdraw his guilty and no contest pleas. It stated that Davis' testimony bore little relation to the charges in the robbery case. As for the homicide case, Carr's purported jailhouse statement tended to inculpate

him. The court noted that the record lacked the statements of the "cooperating witnesses" whom Carr argued he might impeach with Scott's alleged statement to Davis. Furthermore, the court found that Davis "insisted" that his conversation with Scott occurred "some days" after Williams' homicide. Even if none of the witnesses placed Scott at the scene of the shooting, the court reasoned that Scott's statement did not exculpate Carr, because the "question is not whether Scott was present, but rather, whether Carr was present."

After the court sentenced Carr, he appealed in both cases. We sustained his motion to consolidate the appeals and then granted his petition to bypass the Nebraska Court of Appeals.

## ASSIGNMENTS OF ERROR

Carr assigns that the court erred by (1) overruling his motion to withdraw his guilty and no contest pleas because of newly discovered evidence and (2) overruling his motion to withdraw his guilty and no contest pleas because he did not enter them freely, intelligently, voluntarily, and understandingly.

## STANDARD OF REVIEW

[1,2] A trial court has discretion to allow defendants to withdraw their guilty or no contest pleas before sentencing.[1] An appellate court will not disturb the trial court's ruling on a presentencing motion to withdraw a guilty or no contest plea absent an abuse of discretion.[2]

## ANALYSIS

### COURT DID NOT ABUSE ITS DISCRETION BY OVERRULING CARR'S MOTION TO WITHDRAW HIS PLEAS BECAUSE OF NEWLY DISCOVERED EVIDENCE

Carr argues that the court abused its discretion by overruling his motion to withdraw his pleas. He contends that

---

[1] See *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015).

[2] See *id.*

defendants ought to be entitled to withdraw their guilty or no contest pleas upon the "mere suggestion of potentially exculpatory evidence" or the discovery of evidence "material to the preparation of the defense."[3] The State argues that Carr's standard is too lenient and would make withdrawal "automatic."[4]

[3,4] The right to withdraw a plea previously entered is not absolute.[5] When a defendant moves to withdraw his or her plea before sentencing, a court, in its discretion, may sustain the motion for any fair and just reason, provided that such withdrawal would not substantially prejudice the prosecution.[6] The defendant has the burden to show the grounds for withdrawal by clear and convincing evidence.[7]

[5] Newly discovered evidence can be a fair and just reason to withdraw a guilty or no contest plea before sentencing.[8] We have recognized that matters affecting the credibility of a major witness are material to the defense in a criminal case.[9] So evidence which the defendant might use to impeach an important witness for the State, in addition to evidence which

---

[3] Brief for appellant at 24, 34.

[4] Brief for appellee at 21.

[5] *State v. Ortega, supra* note 1.

[6] *State v. Schanaman*, 286 Neb. 125, 835 N.W.2d 66 (2013).

[7] See *State v. Ortega, supra* note 1.

[8] See, *U.S. v. Yamashiro*, 788 F.3d 1231 (9th Cir. 2015); *Winsted v. State*, 241 P.3d 497 (Wyo. 2010); *State v. Kivioja*, 225 Wis. 2d 271, 592 N.W.2d 220 (1999); *State v. Gomes*, 79 Haw. 32, 897 P.2d 959 (1995); *Garnett v. State*, 769 P.2d 371 (Wyo. 1989); *State v. Gallegos*, 738 P.2d 1040 (Utah 1987) (superseded by statute as recognized in *State v. Ruiz*, 282 P.3d 998 (Utah 2012)). See, generally, Annot., 14 A.L.R.6th 517 (2006). But see, *State v. Pitre*, 506 So. 2d 930 (La. App. 1987); *State v. Braverman*, 348 So. 2d 1183 (Fla. App. 1977).

[9] *State v. Brown*, 214 Neb. 665, 335 N.W.2d 542 (1983).

tends to show the defendant's factual innocence, may form the basis for withdrawal.[10]

[6] Carr argues that the court may not consider whether the newly discovered evidence is credible. We agree insofar as the defendant does not have to convince the court that the defendant is innocent or that a jury would acquit the defendant.[11] But even the authority that Carr cites asks whether the newly discovered evidence could have "at least plausibly motivated a reasonable person in [the defendant's] position not to have pled guilty," which requires some judgment as to the potency of the evidence.[12] Furthermore, the court must consider the credibility of the evidence lest the defendant's right to withdraw a guilty or no contest plea becomes absolute: "In order to assess whether a reason actually exists, the [trial] court must engage in some credibility determination of the proffered reason, without which withdrawal would be automatic, a matter of right."[13]

We conclude that the court did not abuse its discretion by determining that Carr failed to show a fair and just reason to withdraw his guilty and no contest pleas by clear and convincing evidence. As the court noted, Davis' testimony bore little relation to the crimes charged in the robbery case. And the statement Carr purportedly made in jail while playing cards—"'I wasn't the one who pulled the trigger first'"—

---

[10] See *U.S. v. Garcia*, 401 F.3d 1008 (9th Cir. 2005). But cf., *State v. French*, 200 Neb. 137, 262 N.W.2d 711 (1978); *Ogden v. State*, 13 Neb. 436, 14 N.W. 165 (1882).

[11] See *U.S. v. Garcia, supra* note 10; *United States v. Morgan*, 567 F.2d 479 (D.C. Cir. 1977). See, also, *State v. Gallegos, supra* note 8.

[12] *U.S. v. Garcia, supra* note 10, 401 F.3d at 1011–12. See, *U.S. v. Bryant*, 557 F.3d 489 (7th Cir. 2009); *Jefferson v. Com.*, 27 Va. App. 477, 500 S.E.2d 219 (1998). See, also, *State v. Kivioja, supra* note 8; *State v. Gomes, supra* note 8; *State v. Gallegos, supra* note 8.

[13] *State v. Kivioja, supra* note 8, 225 Wis. 2d at 291, 592 N.W.2d at 230.

would tend to inculpate Carr for the charges in the homicide case.

That leaves Davis' recollection of his conversation with Scott. According to Davis, Scott told him that "'we'" had made a mistake and that "'Mo'" was dead. The court did not err by emphasizing that Scott's statement would not necessarily exculpate Carr. Newly discovered impeachment evidence may form the basis for a motion to withdraw a guilty or no contest plea, but the fact that the evidence is useful only for impeachment is relevant to the court's exercise of discretion.[14]

Furthermore, the court found that Davis lacked credibility. His deposition testimony was inconsistent with his statements to police. (Davis explained that the police must have "rearranged my words.") And records from the county jail showed that Davis could not have observed Carr's purported jailhouse admission in the manner in which Davis claimed to have observed the admission. Furthermore, as the court found, Davis "insisted" that his conversation with Scott occurred sometime during the first 2 weeks of September 2014, whereas Williams was shot on August 30.

Finally, Carr did not offer at the withdrawal hearing the statements of the "cooperating witnesses" whom he argued Scott's statement would impeach. The only evidence that Scott's statement was inconsistent with the statements of the cooperating witnesses was one sentence in the affidavit of Carr's attorney: "The State's case in both prosecutions is based primarily on cooperating witnesses, none of which [sic] indicated . . . Scott was involved in [Williams'] homicide." So the court did not know, for example, whether the cooperating witnesses purported to give a complete list of everyone involved in the homicide, or if they instead focused on Carr's involvement. The strength of Carr's proof was relevant to

---

[14] See *U.S. v. Bryant, supra* note 12.

whether he met his burden to show a fair and just reason by clear and convincing evidence.

## CARR FREELY, INTELLIGENTLY, VOLUNTARILY, AND UNDERSTANDINGLY ENTERED HIS PLEAS

[7,8] Carr argues that he did not enter his pleas freely, intelligently, voluntarily, and understandingly, because he did not know about Scott's statement to Davis. To support a finding that a defendant freely, intelligently, voluntarily, and understandingly entered a guilty plea, a court must inform a defendant about (1) the nature of the charge, (2) the right to assistance of counsel, (3) the right to confront witnesses against the defendant, (4) the right to a jury trial, and (5) the privilege against self-incrimination.[15] The record must also show a factual basis for the plea and that the defendant knew the range of penalties for the crime charged.[16] Taking the foregoing steps is enough to ensure that a plea is a voluntary and intelligent choice among the alternative courses of action open to a defendant, which is the ultimate standard by which we test pleas of guilty or no contest.[17]

Here, the record shows that the court informed Carr of the nature of the charges, the right to confront witnesses, the right to a jury trial, the privilege against self-incrimination, and the range of penalties for the crimes charged. And the State provided a factual basis for the charges in both cases.

[9] The record does not show that the court informed Carr of the right to assistance of counsel. But this failure does not necessarily render the plea invalid if the defendant was actually represented by counsel.[18] For example, we held in *State*

---

[15] *State v. Ortega, supra* note 1.

[16] *Id.*

[17] See *State v. Irish*, 223 Neb. 814, 394 N.W.2d 879 (1986).

[18] See *State v. Watkins*, 277 Neb. 428, 762 N.W.2d 589 (2009).

*v. Watkins*[19] that the defendant's plea was valid despite the court's failure to inform him of the right to counsel because the defendant was accompanied by appointed counsel when he entered the plea, he told the court he had had enough time to discuss the plea agreement with his attorney and was satisfied with his attorney's efforts, and his attorney told the court that he had no reason to think that the defendant was not freely, intelligently, and voluntarily entering his plea.

We conclude that Carr freely, intelligently, voluntarily, and understandingly entered his guilty and no contest pleas even if the court did not inform him of the right to counsel. Like the defendant in *Watkins*, Carr had appointed counsel at his plea hearing. Carr told the court he had spoken with his attorney about his trial rights and had had sufficient time to do so. Carr also told the court that he was satisfied with his attorney and thought that she was competent. Carr's attorney told the court that she had spoken with Carr about his rights and thought that he understood them. She further said she believed Carr was "freely, voluntarily, knowingly, and intelligently" waiving his trial rights.

## CONCLUSION

We conclude that the court did not abuse its discretion by overruling Carr's motion to withdraw his guilty and no contest pleas because of newly discovered evidence. We therefore affirm.

AFFIRMED.

STACY, J., not participating.

---

[19] *Id.*